[Crim. No. 723. Third Appellate District.—April 29, 1924.]

THE PEOPLE, Respondent, v. E. W. STEFFNER, Appellant.

[1] CRIMINAL LAW—FALSE PRETENSES—JUDGMENT—APPEAL—REVIEW OF EVIDENCE.—On appeal from a judgment of conviction of the crime of obtaining money by false pretenses, the sufficiency of the evidence to support the verdict may be reviewed, although there is no appeal from the order denying appellant's motion for a new trial.

[2] ID.—CASHING OF CHECK—VENUE OF CRIME.—Although the check was drawn in San Francisco, on a San Francisco bank, it having been forwarded to defendant in Lassen County, and he having indorsed same and deposited it to his credit (and not merely for collection) in a Lassen County bank, the superior court of Lassen County had jurisdiction of the crime, irrespective of whether the false pretenses were made in San Francisco or in Lassen County.

[3] ID.—PAYMENT OF CHECK—PRIMA FACIE CASE—BURDEN OF REBUTTAL.—In such prosecution for obtaining money by false pretenses, the prosecution having introduced in evidence the check bearing a general indorsement, and there being nothing in the record inconsistent with the fact that it was paid in due course, this made out a *prima facie* case; and, assuming that defendant might properly make out a defense by showing that the maker was ultimately relieved from payment, the burden to do so, after the *prima facie* showing on the part of the prosecu-

---

1. See 2 Cal. Jur. 304; 2 R. C. L. 193.

2. Venue of offense of obtaining money by false pretenses, note, 49 L. R. A. (N. S.) 834. See, also, 12 Cal. Jur. 462; 11 R. C. L. 854.

3. See 8 Cal. Jur. 29; 8 R. C. L. 171; 11 R. C. L. 864.

tion, was cast upon defendant, and not having done this, he cannot thereafter complain.

[4] ID.—ASSIGNMENT OF AUTOMOBILE SALES CONTRACT — RELIANCE UPON MISREPRESENTATIONS — EVIDENCE. — In this prosecution for obtaining money by false pretenses, as the result of the assignment to a finance company of a conditional sale contract covering the balance due on the purchase price of an automobile which defendant did not own or have possession of and did not deliver to the purchaser named in the contract, the evidence was sufficient to warrant the conclusion that the finance company was induced to part with its money or property by reason of the misrepresentations of defendant as to the ownership, sale and delivery of the automobile, and not solely in reliance upon defendant's guaranty.

[5] ID.—RELIANCE UPON MISREPRESENTATIONS—PROOF—OTHER INDUCING CAUSES.—It is not necessary or essential to a conviction that the person to whom the false pretenses were made shall have expressly testified that it was by reason of such misrepresentations that he was induced to part with his property, nor is it indispensable to a conviction that he take the stand; neither is it necessary that the false pretenses be the sole inducing cause of the owner parting with his money and property.

[6] ID.—CORPORATE EXISTENCE OF DEFRAUDED COMPANY—EVIDENCE—INFERENCES.—In a prosecution for obtaining money from a finance company by false pretenses, and in which the corporate existence of the finance company is put in issue by the plea of not guilty, a mere *de facto* corporate existence is all that is necessary; and in this prosecution, although there was no direct proof of the *de facto* corporate existence of the finance company, such existence was inferable from the facts and circumstances of the case.

[7] ID.—SUBPOENA OF DOCUMENTS—REFUSAL OF WITNESS TO DISCUSS CASE—ANIMUS.—A witness who has been subpoenaed to bring certain documents into court is well within his rights in refusing to discuss the case with the attorneys for either side, or to exhibit to them the subpoenaed documents; and, therefore, the defendant is not prejudiced by the ruling of the trial court in sustaining the prosecution's objection to a question, asked by defendant's counsel on cross-examination, intended to bring out the fact that the witness so conducted himself; and it is immaterial that the purpose of the question was to show the *animus* of the witness.

[8] Id.—Intent—Subsequent Transactions—Irrelevant Evidence. The fact that, after the commission of the crime charged, defendant continued to do business with the defrauded finance company and assigned other automobile sales contracts to it had no bearing on the issues involved in the charge, and evidence thereof was not admissible to show the intent of defendant at the time of the commission of the crime charged.

(1) 17 C. J., p. 205, sec. 3549.   (2) 16 C. J., p. 190, sec. 273, p. 191, sec. 273 (1926 Anno.).   (3) 25 C. J., p. 642, sec. 83.   (4) 25 C. J., p. 653, sec. 91.   (5) 25 C. J., p. 601, sec. 28.   (6) 16 C. J., p. 760, sec. 1560.   (7) 40 Cyc., p. 2673.   (8) 17 C. J., p. 223, sec. 3569 (1926 Anno.).

APPEAL from a judgment of the Superior Court of Lassen County. W. I. Redding, Judge. Affirmed.

The facts are stated in the opinion of the court.

Charles C. Holl, Grover C. Julian, R. L. Waggoner, Archibald M. Johnson and A. A. DeLigne for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy Attorney-General, for Respondent.

GLENN, J., pro tem.—Defendant was convicted in the superior court of the county of Lassen of the crime of obtaining money by false pretenses. Motion for new trial was made and denied; whereupon judgment was pronounced against defendant. The appeal is from the judgment only. No attack is made upon the sufficiency of the amended information under which the conviction was had. We will dispose, preliminarily, of two points. At the time of the filing of respondent's brief herein the record did not disclose the fact that appellant had filed with the clerk and presented an application to the trial court stating in general terms the grounds of the appeal and the points upon which appellant relied, as required by section 1247 of the Penal Code. The record has since been amended, showing compliance with that section. [1] Respondent contends, in a supplemental brief, that as there was no appeal from

8.   See 8 Cal. Jur. 31; 10 Cal. Jur. 797; 8 R. C. L. 179; 10 R. C. L. 925.

the order denying motion for new trial, the sufficiency of the evidence to support the verdict cannot be reviewed. The identical point thus raised was carefully considered, and decided by this court adversely to respondent's contention, in the case of *People* v. *Clayton*, 33 Cal. App. 357 [165 Pac. 37]. The various code sections applicable to the matter were reviewed in detail. Since that decision, rendered in 1917, several sessions of the legislature have intervened, and no material changes have been made. Appeals, doubtless, have been taken in reliance on the construction thus placed thereon. No new point has been presented which was not there considered, nor do the cases now cited by respondent throw additional light upon the subject. We see no reason to doubt the correctness of the holding in that case, and adhere to the same.

The amended information charges, in substance, that the defendant, E. W. Steffner, transacting business under the name and style of Steffner Overland Company, with intent to defraud the L. F. Weaver Company, a corporation, and with intent to obtain its money and personal property, fraudulently represented to it that he was the owner of, and had sold and delivered, under a conditional contract of sale, to Charles Baum, a certain automobile therein described; that defendant could and would assign, sell and convey, and had assigned, sold and conveyed, said automobile and said contract and the moneys payable thereunder, to said L. F. Weaver Company, a corporation; whereas, in truth and in fact, the said automobile was then and there the property of Anglo-California Trust Company, and had not been sold or delivered to said Charles Baum, and that the conditional contract of sale was fraudulent and void, and that said automobile and the conditional contract therefor could not be sold or assigned by defendant; that said Weaver Company believed said representations, and by reason thereof and on the security of said automobile and said purported and fraudulent assignment of the conditional contract for the sale thereof, it paid over to defendant the sum of thirteen hundred dollars, or thereabouts.

Defendant was an automobile dealer transacting business at Susanville, Lassen County, California, under the name of Steffner Overland Company. On July 1, 1922, he entered into a contract with George A. Leal for the sale to

him of the automobile described in the amended informa-
tion, eight hundred dollars being paid at the date of the
signing of the contract, the balance amounting to $1,253.75,
payable in monthly installments, covering a period of twelve
months. By the terms of the contract, title to the automo-
bile was retained in the seller. The agreement contains
many provisions with reference to the care, possession and
other matters usually dealt with in such contracts, but which
need not be detailed. Attached thereto are several docu-
ments, designated, respectively, "Purchaser's Statement,"
"Dealer's Recommendation and Warranty of Title," and
"Seller's Assignment and Guaranty." By the terms of
the assignment appellant transfers his interest in the con-
tract and the property therein described to the Anglo-
California Trust Company, warrants title to the property,
his right to assign the same, that it is free and clear of
all liens and encumbrances, and guarantees performance by
Leal of all the terms of the contract, including prompt pay-
ment of the purchase price. Thereupon these documents
were forwarded by appellant to the Anglo-California Trust
Company. The company accepted the assignment, and on
July 10, 1922, forwarded to appellant its check for the sum
of $1,175.72, being the amount represented by the deferred
installments, less discount and other incidental charges.
On August 24, 1922, said company was informed by letter
from appellant that Leal desired a smaller car, and hence
he was selling him a four-cylinder car, and he was also
selling the car originally purchased by Leal to a Mr. Lackey.
The letter states, in part: "In selling this car to Mr.
Lackey we have figured the brokerage as though it were
a new car, which it really is. We wish you to take up
the balance due on the contract of George Leal, and we
believe there will be a refund of brokerage charge and if
possible transfer the Leal insurance policy to Lackey. Any
way you wish to transfer this contract will meet with our
approval, as we are well acquainted with both purchasers
and can adjust the matter with them. . . . We have in-
cluded in the contract the sum of $24.00 to cover insurance
premiums in case you cannot transfer the Leal Policy." In-
closed with the letter was an agreement of sale and purchase
between Steffner Overland Company, as the seller, and
J. W. and W. H. Lackey, as the purchasers, similar in form

and substance to the one between the defendant and Leal. This contract recites that the sum of $800 is paid upon the date of signing, leaving a balance due of $1,258.25, payable in monthly installments. It is signed "Steffner Overland Co. by E. W. Steffner Mg. and J. W. & W. H. Lackey by J. W. Lackey." Attached thereto is the seller's warranty of title, assignment and guaranty, similar in substance to the one attached to the contract between appellant and Leal. Conformably to appellant's instructions, the Anglo-California Trust Company, upon receipt of said contract and the assignment thereof, made its usual discount and other incidental charges amounting to $78.02, deducted this sum from the amount unpaid on the contract, as indicated by the deferred installments, leaving a net balance of $1,180.23, which was credited as a payment on the prior contract of George A. Leal covering the same car. On September 23, 1923, appellant wrote to the Anglo-California Trust Company, asking to be advised promptly of any default in payment on the part of Lackey; that if the first payment then past due had not been paid, to wire him, as he had received word that the account should be watched closely, it being his intention to repossess the car in case any payment became delinquent. In answer thereto the appellant was advised that the payment due on the twentieth had not been received. During the first week in October, 1922, R. F. Wentworth, a representative of the Anglo-California Trust Company, called on the defendant, and together they went over the various delinquent accounts. The Lackeys being in default, Wentworth and defendant proceeded to Westwood, secured the automobile, and returned with it to Susanville, where it was placed in a garage in the name of the Anglo-California Trust Company. The car was never thereafter in the possession of defendant, having remained in the garage at all times up to the date of the trial excepting on several occasions when it was taken out by a representative of the said company, but not with reference to any matter with which defendant was concerned. Defendant testified that he had been given to understand by Wentworth, on the trip back from Westwood, that there was no objection to the car being sold by him so long as the company's interests were protected. This was not only denied by Wentworth, but the latter stated that he

had told defendant that the automobile must remain in the garage until word was received from the Anglo-California Trust Company to release it to Mr. Lackey. In view of the conflict in this regard the verdict of the jury must be accepted as an implied finding against appellant.

The possession of the automobile and the title thereto thus stood on October 16, 1922. On that date, and unbeknown to the Anglo-California Trust Company, defendant entered into a conditional sales contract with one Charles Baum for the sale to him of the automobile originally contracted to be sold to Leal, the purchase price being $1,985, the contract reciting the payment of $685 at the date thereof, leaving a balance of $1,300, payable in monthly installments. This contract, together with the assignment thereto attached, is in the same general form and substance as the previous contracts and assignments to which reference is made above. Therein defendant affirms that the automobile in the contract described (and being the same automobile originally sold to Leal) has been delivered to Baum; he assigns and conveys to the L. F. Weaver Company all his right, title and interest in and to the contract, the property therein described, the moneys payable thereunder, and warrants that he has the right to assign the title, and that the same is free from any and all liens and encumbrances; he also guarantees payment by Baum and full performance by the latter of all covenants. These documents were forwarded to the L. F. Weaver Company at San Francisco for discount. The contract and assignment were received and accepted by said company, and, in conformity with the request made in the letters accompanying the same, the L. F. Weaver Company deducted discount and other incidental charges, and mailed its check for the sum of $1,269 to defendant, which was deposited by him to his account in the Lassen Industrial Bank at Susanville. As Baum was unable to secure possession of the automobile, by reason of the fact that it was stored in a garage in the name of the Anglo-California Trust Company, the check given by him to defendant at the time of entering into the contract was ultimately returned.

The alleged false pretenses consisted in the statements made in the contract with Baum, the warranties and representations in the assignment thereof to the Weaver Com-

pany and in the letters of transmittal accompanying the same.

Appellant does not deny the receipt of the check from the Weaver Company and the deposit of the same to his account in the Lassen Industrial Bank, but claims that it was the general custom of himself, as well as other automobile dealers, in cases where contracts had been discounted with banks, to repossess the cars, in case of default in payments thereon, and to resell the same, and to rediscount the contract on the second sale, either to the original financial institution to which it had been assigned, or to other financial firms; that when thus repossessed, resold and rediscounted, the balance, represented by the deferred payments, was handled by either crediting the amount thereof on the first contract, or by permitting the contract to be paid monthly according to its terms, or otherwise caring for the same; and that such had been the custom and manner of his dealing with the Anglo-California Trust Company. In other words, appellant's position is that he was left to deal freely with said automobiles much the same as though he was the absolute owner thereof. For the purpose of substantiating his claim in this regard, a number of transactions were gone into during the course of the trial, but a careful inspection of the record fails to disclose anything in these transactions analogous to the present case or justifying appellant's contention. They were made subject to approval and acceptance by the Anglo-California Trust Company. The new contracts and the assignments thereof were forwarded to it for approval and discount, but in such contingencies no additional advancements were made so far as we have noted. Even if further sums were advanced the security remained intact. These transactions merely amounted to the substitution of one contract for another, subject to the approval of the Anglo-California Trust Company.

[2] The letters and documents containing the false representations were executed and mailed by appellant in Lassen County, addressed to the Weaver Company at San Francisco. The check in payment for the amount represented by the deferred payments, in the conditional contract of sale between appellant and the purchaser, Charles Baum, was drawn by the Weaver Company on the Anglo and London-

Paris National Bank, located at San Francisco, and mailed by said Weaver Company to appellant at Susanville, Lassen county. He indorsed the same and deposited it to his credit in the Lassen Industrial Bank at Susanville. It is indorsed: "Steffner Overland Co. E. W. Steffner. Pay to the order of any bank or banker. All prior endorsements guaranteed. October 21, 1922. Lassen Industrial Bank, Susanville, W. G. Culbreth, Cashier."

From these facts it is contended that the superior court of Lassen county lacked jurisdiction, as the crime was neither wholly nor partly committed in said county; that the false pretenses, if any, were made when received by the Weaver Company at San Francisco; that the money, if obtained at all, was received by appellant when the bank in San Francisco upon which it was drawn honored it; hence, it is asserted, also, that the evidence is insufficient to show that the Weaver Company ever parted with its money, or that appellant ever obtained the same. These questions will be considered together. Respondent relies upon the provisions of section 781 of the Penal Code to the effect that where an offense is partly committed in one county, and partly in another, jurisdiction is in either county.

Appellant cites the cases of *People* v. *Griffith,* 122 Cal. 212 [54 Pac. 723]; *People* v. *Cummings,* 123 Cal. 269 [55 Pac. 898], and *Golden* v. *Justice's Court,* 23 Cal. App. 778 [140 Pac. 49], as holding that the representations were made where received. These cases throw little, if any, light on the questions presented here. The crime of obtaining money by false pretenses is a continuing crime and may be committed in more than one county. (*People* v. *Dimick,* 107 N. Y. 13 [14 N. E. 178]; *People* v. *Boggess,* 42 Cal. App. Dec. 558.) It is true there is a conflict in some of the authorities as to whether the representations are deemed to have been made where mailed (*People* v. *Arnstein,* 157 App. Div. 776 [142 N. Y. Supp. 842]; 12 Am. & Eng. Ency. of Law, 2d ed., 848; *Reg.* v. *Holmes,* 12 Q. B. D. 23) or where received (*People* v. *Gibson,* 132 Iowa, 53 [106 N. W. 270]; *State* v. *Smith,* 162 Iowa, 336 [49 L. R. A. (N. S.) 834, 144 N. W. 32]). The subject is discussed and some of the cases annotated in Annotated Cases 1917E, pages 311 and 312. But the question of where the fraudulent representations were made is not determinative of this

case, for the reason that we are dealing with acts other than the mailing or receipt of the letters and documents. The check sent by Weaver & Co. to appellant was indorsed by him and deposited to his credit in the Lassen Industrial Bank in Lassen County. These were acts in furtherance of the fraudulent design (*People* v. *Boggess, supra*) and completed the crime of obtaining money by false pretenses. (*State* v. *Smith,* 162 Iowa, 336 [49 L. R. A. (N. S.) 834, 144 N. W. 32] ; also, to the same effect, *Burton* v. *United States,* 196 U. S. 283 [49 L. Ed. 482, 25 Sup. Ct. Rep. 243, see, also, Rose's U. S. Notes].) The placing of the check in the bank to appellant's credit was the equivalent of securing the money. (*State* v. *Mason,* 62 Mont. 180 [204 Pac. 358] ; *State* v. *Smith, supra.*) But it is argued by appellant that this does not constitute a payment by the Weaver Company, for the reason that the Lassen Industrial Bank was not the agent of the Weaver Company for the payment of the check; that the relation of debtor and creditor, instead of principal and agent, ensued, and for the further reason that the evidence fails to disclose that the check was ever paid by Weaver & Co. or charged against it by the bank on which it was drawn. Respondent cites *People* v. *Whalen,* 154 Cal. 472 [98 Pac. 194], and *People* v. *Leavens,* 12 Cal. App. 180 [106 Pac. 1103], in answer to these contentions. These cases are not, however, strictly in point. In the former the evidence was sufficient to warrant the jury in finding that the money represented by the check had actually been paid by the prosecuting witness, and in the latter case the check was paid by the bank on which it was drawn, the bank being the agent of the drawer thereof. The identical question as to the effect of the payment by a bank other than the one on which it was drawn, of a check secured by means of false representations, arose in a case decided by the supreme court of the state of Iowa, and that court, in an exhaustive and carefully considered decision, held that the securing of the money under such circumstances completed the crime and that the venue was properly laid where the check was cashed. (*State* v. *Smith,* 162 Iowa, 336 [49 L. R. A. (N. S.) 834, 144 N. W. 32].) To the same effect is the case of *Burton* v. *United States,* 196 U. S. 283 [49 L. Ed. 482, 25 Sup. Ct. Rep. 234, see, also, Rose's U. S. Notes]. The facts in the Smith case, *supra,* are not

distinguishable from the facts in the present case, excepting that the evidence in that case showed that the check was ultimately paid by the bank on which it was drawn prior to the institution of the prosecution of the case, but the decision does not depend upon that point, and the same may be said with reference to the Burton case, *supra.* It would unduly extend this opinion were we to attempt to quote from these cases. They hold, however, that the moment the check is cashed that moment the drawer is defrauded; that had the check been deposited for collection a different question would then arise; but in such a case as the present, where a check is deposited to one's account, or cashed, the relation of debtor and creditor arises and the title to the check immediately passes to the bank. (See, also, *Bates* v. *State*, 124 Wis. 612 [4 Ann. Cas. 365, 103 N. W. 251]; *People* v. *Ballas*, 55 Cal. App. 749 [204 Pac. 401].) We see no escape from the logic of these cases. They state the law, in our opinion, applicable to the facts of this case on the questions above suggested. [3] Before passing this phase of the case it might be well to call attention to the fact that the check bears a general indorsement, and there is nothing in the record inconsistent with the fact that it was paid in due course. The least that can be said, under the circumstances, is that the prosecution made out a *prima facie* case, and assuming, without deciding, that the defendant might properly make out a defense by showing that the maker was ultimately relieved from payment, the burden to do so, after the *prima facie* showing on the part of the prosecution, was cast upon him, and not having done this, he cannot now complain.

[4] It is contended that there was no evidence, either direct or circumstantial, that the L. F. Weaver Company was induced, either wholly or in part, by reason of any alleged misrepresentations, to part with its money or property. For aught that appears it may have relied solely upon appellant's guaranty.

The transaction was the ordinary one of an automobile dealer assigning an installment contract for discount, in order to replenish his capital to carry on business. The correspondence indicated that both parties understood that in the assignment of the Baum contract by defendant, and the acceptance thereof by the Weaver Company, it relied

upon the security thereby purported to have been transferred to it. Three letters accompanied the contract and assignment. In the first appellant asks that remittance on the contract be mailed direct to him, instead of depositing it in an account in the Anglo-California Trust Company as had been done in the past, showing a purpose to conceal knowledge of the transaction from the Anglo-California Trust Company. The second letter deals with the question of insurance covering the car. Request is made that the same be insured against fire and theft "together with what other insurance you may require" for $1,500. If appellant understood that the Weaver Company was relying on his guaranty alone, there would be no occasion for him to assume said company would require or be concerned with insurance, other than such as appellant himself might suggest. The third letter contained a financial statement of the transaction, with a request for remittance of the sum of $1,300, less discount charges. Upon receipt of the contract, assignment and letters accompanying same, the secretary of the Weaver Company, not being familiar with the particular transaction, handed the same over to Weaver, who appeared to be in authority. The latter gave his approval thereto and it was put through in the usual way. In the letter transmitting the check to appellant it was stated that it was sent "in settlement of the contract signed by Charles Baum." There is not a word in the record which suggests or intimates that it was other than by virtue of the contract and the assignment thereof and the reliance thereon by the Weaver Company that appellant obtained the check which was subsequently deposited to his account in the Lassen Industrial Bank; in fact, no such defense was made during the trial. The position then assumed was that appellant had the right to the possession of the automobile and authority to sell and assign the Baum contract to the Weaver Company, and that his title was free and clear of all other claims or liens. We fail to find any justification for the contention that the evidence showed that the warranties in the contract had often been disregarded by the lender (L. F. Weaver Company) in its dealings with appellant. The fact is the record merely shows this one transaction, at least, so far as the point now suggested is concerned. In addition to the warranty with reference to

the title to the automobile, appellant certified that he had delivered possession to Baum, whereas the real fact was that possession had not been delivered, nor could delivery be made, for the reason it stood in a garage in the name and under the control of the Anglo-California Trust Company, with knowledge on the part of appellant that it was to so remain until an order was secured from said company for its release. The order was never secured.

[5] It is not necessary or essential to a conviction that the person to whom the false pretenses were made shall have expressly testified that it was by reason of such misrepresentations that he was induced to part with his property, nor is it indispensable to a conviction that he take the stand. "The jury may be fully satisfied on the testimony of others, and from all the circumstances in the case, that the representations did induce him to turn over the property to defendant." (*People* v. *Hong Quin Moon*, 92 Cal. 41 [27 Pac. 1096].) Neither is it necessary that the false pretenses be the sole inducing cause of the owner parting with his money or property. It is sufficient if it had a material influence, although he was also induced by other causes. (25 Corpus Juris, 601.)

Testing the facts by the above rules, we have no hesitancy in holding that the jury was fully justified in its conclusion that the false representations did have a material influence on the Weaver Company in parting with its property, notwithstanding the fact that in the assignment the appellant does warrant full performance of all the terms and conditions of the contract between him and Baum.

[6] The next point urged by appellant is that "there was no evidence to support the allegation the L. F. Weaver Company was or is a corporation either *de facto* or *de jure*, and the verdict of the jury fails of support in this essential." In this connection it is claimed that the question of the corporate existence of said company was put in issue by his plea of not guilty and the burden was thereby cast upon the prosecution to prove such fact the same as any other material fact in the case.

Prosecution was had under the provisions of section 532 of the Penal Code. That section provides, in part: "Every person who knowingly and designedly, by false or fraudulent representation or pretenses, defrauds any other person

of money, labor or property . . . is punishable in the same manner and to the same extent as for larceny of the money or property so obtained.''

It is urged in support of the position that at least the *de facto* corporate existence of said company must be shown, that the "other person" mentioned in said section (the party defrauded and described in the amended information, herein as the L. F. Weaver Company, a corporation) must be the identical person mentioned therein as the victim of the fraud, otherwise a variance would ensue; that in the present case there was not a mere variance, but an utter failure to prove that the "other person" (the alleged defrauded party) existed, by reason of the failure to show corporate entity, either *de facto* or *de jure*, on the part of said Weaver Company.

Respondent suggests that the corporate existence of said company was treated and assumed throughout the entire case as an admitted fact by both sides. The suggestion of respondent in this regard is not without support, at least so far as the rule in civil cases is concerned. In *Lewis* v. *Bank of Kentucky*, 12 Ohio, 132 [40 Am. Dec. 469], it is said: "In almost every trial there are facts, necessary to make out the case, which, by the parties, are treated as admitted, without requiring formal proof. To make the absence of express proof in such case ground for error, after verdict and judgment, would be unfair and attended with great inconvenience.''

More specific, however, is the language of the court in the recent case of *Gilmore* v. *Caswell*, 65 Cal. App. 299 [224 Pac. 249], wherein it is said: "An examination of the cases all show that something was said or done which justified the assumption of the existence of the facts necessary to appear and to be made to appear in order to support the judgment.''

We are of the opinion that the corporate existence of the L. F. Weaver Company is to be inferred from the evidence in the case rather than from admissions claimed to have been made by the parties.

It is conceded that in a criminal case, where such fact is an element of the crime (although it is not necessarily such in all character of criminal cases), a mere *de facto* corporate existence is all that is necessary to be shown. An

interesting and illuminating case on the subject is *United States* v. *Amedy,* 11 Wheat. 392 [6 L. Ed. 502, see, also, Rose's U. S. Notes]. We quote therefrom as follows:

"The next question is whether before the policy of insurance underwritten by the Boston Insurance Company could be given in evidence, it was necessary to prove that the subscription to the stock, and the payment of such subscription, as required by the act of incorporation, had been made. In our opinion it was not. This is not the case where a suit is brought by the corporation to enforce its rights, where, if the fact of its legal existence is put in controversy upon the issue, the corporation may be called upon to establish its existence. The case of *Henriquez and Van Moyses* v. *The Dutch West India Company,* cited in 2 Lord Raym. 1535, as decided before Lord King, whatever may be its authority, was of that sort, and therefore carries with it an obvious distinction; nor is this the case of a *quo warranto,* where the government calls upon the company to establish its legal corporate powers and organization. The case here is of a public prosecution for a crime, where the corporation is no party, and is merely collaterally introduced as being intended to be prejudiced by the commission of the crime. *Under such circumstances we think nothing more was necessary for the government to prove than that the company was de facto organized and acting as an insurance company and corporation. The very procurement of a policy by the prisoner, to be executed by the company, was of itself prima facie evidence for such a purpose.* In cases of the murder of officers, it is not necessary to prove that they are officers by producing their commissions. It is sufficient to show that they act *de facto* as such. In cases of piracy, it has been held sufficient to establish the proprietary title to the ship by evidence of actual possession of the party claiming to be owner. These are analogous cases, and furnish strong illustrations of the general principle. . . . The next question arises upon the instruction of the Court 'that it was not material whether the company was incorporated or not; and it was not material whether the policy were valid in law or not; that the prisoner's guilt did not depend upon the legal obligation of the policy, but upon the question whether he had willfully and corruptly cast away the vessel, as charged in the indictment, with in-

tent to injure the actual underwriters.' We think this opinion correct. The act of Congress of the 26th of March, 1801, chapter 40, on which this indictment is framed, declares 'that if any person shall, on the high seas, willfully and corruptly cast away, etc., any ship or vessel, of which he is owner, etc., with intent or design to prejudice any person or persons that hath underwritten, or shall underwrite, any policy or policies of insurance thereon, etc., the person or persons offending therein, etc., etc., shall suffer death.' The law punishes the act when done with an intent to prejudice, it does not require that there should be an actual prejudice. The prejudice intended is to be to a person who has underwritten, or shall underwrite, a policy thereon, which, for aught the prisoner knows, is valid; and does not prescribe that the policy should be valid, so that a recovery could be had thereon. It points to the intended prejudice of an underwriter *de facto*." (Italics ours.)

In *Fleener* v. *State*, 58 Ark. 98 [23 S. W. 1], the court holds that a *de facto* corporation may be the victim of embezzlement; that evidence of general reputation of corporate existence is sufficient, and adds: "And, if the same rule is to be applied in criminal as in civil cases, it would seem that one dealing with even an ostensible corporation, as such, is not permitted to deny its corporate existence."

In *Norton* v. *State*, 74 Ind. 337, it is said: "The Court permitted a witness to state that the Terre Haute and Evansville Railroad Company was a corporation. There was no error in this. It was proper to prove that the railroad company was known and acting as a corporation. Wharton Criminal Evidence, sec. 164a. This doctrine is the logical sequence of the doctrine declared in *Smith* v. *The State*, 28 Ind. 321. It is indeed doubtful, whether it was incumbent upon the State to do more than prove that there was an artificial being assuming and acting under a name indicating and implying a corporation."

In *People* v. *Ah Sam*, 41 Cal. 645, it is said: "The next question is one of greater importance and of much more difficulty: The indictment charges the defendant with feloniously having in possession certain blank and unfinished bills in the form and similitude of a bill for the payment of money, to be issued by an incorporated bank, viz.: The Chartered Bank of India, Australia, and China, a foreign

corporation then lawfully organized and incorporated under the laws of the United Kingdom of Great Britain and Ireland, and then carrying on business as such banking corporation at Hongkong, in China, etc., with intent, etc., to defraud the said The Chartered Bank of India, Australia, and China. On the trial the prosecution was permitted to prove the existence of The Chartered Bank of India, etc., by reputation, that it was acting as a corporation and as a banking house, and as such issued bank bills, which were received as current in certain countries. The materiality of the evidence, if it be material, arises entirely from the unnecessary allegations of the indictment. It was not necessary to charge that the banking house whose bills were imitated, was an incorporated company. If it were a banking company, actually issuing bank bills, which were current anywhere, it is sufficient. The corporate character of the company is supposed to become material just as, in an indictment for stealing a *black* horse, though it was unnecessary to aver that the horse was black, yet it being averred it becomes material, in order to establish the identity of the crime. So, here, the fact that the company was incorporated becomes material only as a matter of description, and not an element of the crime. We do not admit the justice of the comparison. It would be equally an offense whether the company be actually incorporated or not, so it is acting as a corporation and issues bank bills which are current. So, too, as a matter of identity, we think the description is satisfied by proof that the company is known as a corporate company and is acting as such, and as such issues bills which come within the statute. The case is widely different where a suit is pending, in which the legal existence of the corporation may be made an issue. (*U. S.* v. *Amedy,* 11 Wheat, 392 [6 L. Ed. 502, see, also, Rose's U. S. Notes]; *People* v. *Frank,* 28 Cal. 507.)''

In *People* v. *Frank,* 28 Cal. 507, the defendant was charged with having forged an indorsement on a draft with intent to defraud the Utah Mining Company, alleged to be a corporation, and other persons. One Newby, a witness produced by the prosecution, testified that he had found the draft with the vouchers of the Utah Company; that he was president of said company. The draft was as follows: ''Utah Mining Company, Aurora N. T. Sept. 18th, 1864,

$334.56. Ten days after sight, pay to the order of H. Bloomingdale & Co. three hundred and thirty-four fifty-six one hundredths dollars, value received, and charge the same as advised. F. J. Baum, Sup't. To M. Frank Esq., President Utah Mining Company, San Francisco." This appears to have been all the evidence as to the corporate existence of said company. It was claimed, among other things, that the Utah Mining Company was not a corporation, and therefore could not have been defrauded. As to this the court said: "Whether the Utah Mining Company was a corporation *de jure* or not was not an issue in this case. If it was acting as such that was sufficient." The court added, however: "But admitting that the Utah Mining Company is not a corporation, the indictment also charged an intent to defraud Howard, who certainly had a legal existence."

In the case at bar the facts are much stronger in this regard than in the Frank case, *supra.* While it is true there was no *direct* proof of the *de facto* corporate existence of the said L. F. Weaver Company, still we are of the opinion that the corporate entity of said company is inferable from the facts and circumstances of the case. We cannot agree with the contention of appellant, that for aught that appears it may have been a copartnership. All the correspondence from said defendant to said company and from it to him was in the name of said company as an entity. The assignment made by him was to the L. F. Weaver Company. The check procured by defendant was signed "L. F. Weaver Company by Kenton Weaver, *Vice-President";* and in this connection we direct attention to the language of the court italicized by us in *United States* v. *Amedy, supra.* A witness testified that he was *Secretary* of said *Company,* stating also the character of the business in which it was engaged. Thus it appears that said company was transacting business, not as an individual or individuals doing business under a trade name, or as a copartnership, but ostensibly as a corporate entity *operating through its officer.* This was a sufficient *prima facie* showing in a criminal case. There was no proof to the contrary. The defendant's guilt or innocence does not turn upon the question of its corporate entity, the evidence clearly justifying the implied finding of the jury that said company had been defrauded in the manner as charged. The transaction was in no manner

changed by the character of proof on the question of corporate existence; the defendant is fully protected against further prosecution for the same offense and his substantial rights were in no manner adversely affected.

Defendant asserts that had corporate existence of said company been shown, a chance would have been given him on cross-examination to have ascertained the causal connection, if any, between the alleged false pretenses and the parting with its property by said company; also as to what extent, if any, the corporation, or the person assuming to act for it, had been deceived; and it is also suggested that said company may have purchased the Baum contract on the joint or several responsibility of Baum and the defendant, as to which, so it is claimed, there was no evidence. We have heretofore discussed this feature of the case under another point, and will only add that the evidence showed the names of the representatives of the Weaver Company who handled the transaction on its behalf and authorized its acceptance, together with the surrounding facts and circumstances, and all the other details of the transaction, as fully as if there had been direct proof of either its *de jure* or *de facto* corporate existence. As previously stated, one of the witnesses was secretary of said company and testified to that fact; also as to the business conducted by it. The fact that a copy of the articles of incorporation of said company was not introduced, or that no witness was directly interrogated by the prosecution as to its corporate existence, did not prevent defendant, who was party to the entire transaction and conversant therewith, from bringing out on cross-examination, had he so desired, such information as he might have deemed necessary. Under the circumstances, it is but reasonable to infer that defendant was satisfied, during the trial, with those details of the transaction which he now asserts he was prevented from ascertaining by reason of the alleged failure to prove the corporate entity of said company.

The corporate existence of a company, the alleged victim in the commission or attempt to commit a crime, is not, in every criminal case, an element of the crime. Different factors enter into a determination of the question. No general rule on the subject can be laid down as applicable to all criminal cases, although mere excerpts from some might lead

to the opposite conclusion. As the views we have expressed render a discussion of the subject unnecessary, we shall refrain from a further reference thereto.

Two instructions proposed by defendant were refused by the court, and the failure to give the same is now assigned as error, although the grounds upon which the contention is based are not set forth. These proposed instructions will be found in the clerk's transcript, the first on page 48, commencing at line 18, and the second on page 51. The first of these is extremely argumentative. Both, however, were substantially covered by instructions given. (Clerk's transcript, page 29, lines 4 to 24; page 31, lines 8 to 16; page 32, lines 3 to 11; pages 33, 36 and 39.)

It is claimed the court erred in sustaining objections interposed by the prosecution to two questions asked the witness Stanbury. (The reference given is incorrect. The questions will be found on pages 111 and 112 of the reporter's transcript.) The record discloses the following:

"(By Mr. Holl) Q. Did you bring with you the four contracts which you were directed by this subpoena to bring with you? By Mr. Hardy: We object to that as immaterial and irrelevant and not proper cross-examination. By the Court: I think the objection is good, but I don't see any object in making it. This witness is subpoenaed by the defense. If you insist upon it I will sustain it. By Mr. Hardy: The proper place to put that in is in his defense. By the Court: I think so too. By Mr. Holl: I am going to ask another question. Have you since your arrival here refused to discuss the case in any way with the attorney for the defense, myself, and refused to exhibit such, any contracts in your possession, described in this subpoena? This is for the purpose of showing *animus* of the witness. By Mr. Hardy: Object to that as incompetent, irrelevant, immaterial and not proper cross-examination. By the Court: Objection sustained. This is not the time and place to take that matter up. By Mr. Holl: I think in fairness I should say I am offering this to show the *animus* of the witness, his interest and the fact that he is opposed mentally to the defendant. By the Court: You haven't any right to argue that question. There is a way to get at that, and you probably understand how to do it. By Mr. Holl: That is all."

There appears to have been no definite or final ruling on the first question; but irrespective of this, no claim is made that the contracts referred to were not produced in response to the subpoena, hence, the relevancy of the question is not apparent. [7] The objection to the second question was properly sustained. The witness was well within his rights to have refused to discuss the case with the attorneys for either side, or to have exhibited to them documents which he was required by the subpoena to produce in court. An affirmative answer, therefore, under the circumstances, would have disclosed no prejudice. The ruling of the court in sustaining the objection to the last question did not preclude the defendant from a line of questions, answers to which would tend to show whether or not the witness was biased or prejudiced against him. It is claimed, however, that the remarks of the court in sustaining the objection were prejudicial. The remarks of the court, as will be observed, were made in response to a statement by counsel for defendant, after the court had sustained the objection to the question, apparently for the purpose of shutting off further argument and directing attention to the fact that if it was desired to bring out the facts which counsel claimed to exist, a different line of examination should be pursued.

[8] It is finally urged that the court erred in sustaining an objection by the prosecution to a question whereby it was sought to elicit from defendant the fact that after the commission of the crime charged he had assigned other contracts to the L. F. Weaver Company, the object of the question being, so it was stated, to show that defendant could have had no intent to defraud in assigning the Baum contract, otherwise he would not have placed additional assets in the hands of said company. There is no merit in the contention. After the objection had been sustained, permission was given defendant to submit authorities and to reopen the question. Thereupon counsel for defendant stated: "All right, I will abandon that now and go on to this matter." If the matter was not again brought to the attention of the court it must be assumed that defendant was satisfied with the correctness of the ruling made. There was no error, however, in the ruling so made. The subsequent acts of defendants in relation to other contracts had

no bearing on the issues involved in the charge. Under the circumstances they were not relevant, but would be rather in their nature self-serving, and in no way tend to show the intent of defendant at the time of the commission of the crime charged. In *Gardner* v. *State* 4 Ala. App. 431 [58 So. 1001], defendant was charged with obtaining money under the false representation that he was the owner of a certain tract of land. It was claimed the court erred in refusing to permit testimony as to the subsequent conduct of defendant in attempting to perfect his title thereto. The court held: "What the defendant did after the commission of the offense was not relevant, and testimony of his subsequent actions or conduct was not admissible, even in mitigation of the offense, and the court properly refused to allow the defendant to make proof of what efforts he afterwards made to perfect title to the land or whether he was prevented from doing so by an injunction."

The foregoing disposes of all the points raised by appellant. In view of the suggestion made that defendant intended no wrong, and was improperly convicted of the offense upon which he was tried, we have gone over the entire record. Without reiterating the facts, we will say the case was fairly tried, the defense was permitted a wide latitude, the Weaver Company was defrauded of a considerable sum by the defendant in the manner charged, and the record amply justifies the conclusion reached by the jury; hence we see no reason for disturbing its verdict.

The judgment is affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 26, 1924.

All the Justices concurred.