[Crim. No. 4405. Second Dist., Div. Three. Feb. 21, 1950.]

THE PEOPLE, Respondent, v. ALMON DEAN CHAMBERLAIN et al., Defendants; JOSEPH H. WRIGHT, Appellant.

Gladys Towles Root for Appellant.

Fred N. Howser, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

WOOD, J.—Appellant Wright and one Chamberlain were charged with grand theft. Trial was by jury. At the close of plaintiff's case, the information was dismissed as to Chamberlain upon motion of the district attorney. Wright was convicted, and he appeals from the judgment. He contends that the evidence was insufficient to support the judgment.

On January 18, 1949, while Leon Furra, the victim, was tending bar in his tavern known as the Paddock Café, and while defendants Chamberlain and Wright were sitting at the bar, as his customers, Chamberlain introduced Wright to Furra as the owner and trainer of horses. Wright gave Furra a card on which was printed "J. H. Wright, owner and trainer of thoroughbred horses." Wright told him that he owned the horse named "Exigen," and various other horses; and asked him if he ever bet the horses. When Furra replied that he did bet occasionally, Wright told him that he might have "something going" the next day and he would call Furra. The next morning Wright returned to the bar and told Furra that he had a race fixed that would be run that afternoon, that the race would be easy to fix because a certain jockey was not riding that day, and that he (Wright) would give Furra the information if Furra would give him $1,100 as his contribution toward the fixing of the race. Wright said that Furra would not have any time to think it over because he (Wright) had to go to the track to take care of it. When Wright showed Furra his driver's license "registered" to his home address in Glendale, Furra went to his bank with Wright, in Wright's automobile, and withdrew $1,100 in $100 bills. Before returning to the automobile, Furra "took down" the serial numbers of the bills. They returned to the tavern, and then Furra gave Wright the $1,100, and Wright gave him the name of a horse. Then Wright told him to go to the track and bet $1,500 on the horse to win, that it would prob-

ably pay four or five to one. Furra went to the track and bet $1,500 on the horse to win, but it ran third.

The next morning Wright told Furra by telephone that the horse lost a shoe and the best they could do was to bring him in third, but "today" they had a long price horse that would make up for what Furra had lost. Then Wright said he would let Furra speak with jockey Allan Gray. Then another voice on the telephone said he was Allan Gray, and that "today they really had it all fixed"; and he told Furra to wire $1,000 to A. E. Gray in care of the North Hollywood Western Union, and as soon as they could confirm that the money was there they would give him the name of the horse. After that conversation Furra told a deputy sheriff what had happened. The deputy sent a telegram to the Western Union office in North Hollywood. That afternoon Wright told Furra by telephone that he had received confirmation that the money was there; and he gave Furra the name of a horse and told him to bet on it. Furra did not act on the information.

The next morning, January 21, 1949, Wright telephoned Furra and asked how he had done, and Furra replied that he had bet on the horse but had not made anything. Then Wright said he really had a longshot horse, and he told Furra to deliver $1,400 in an envelope marked Joseph Wright or J. P. Wright to the Coliseum Hotel, and that as soon as he received confirmation that the envelope was there he would give the name of the horse. Furra then telephoned the sheriff's office, and two officers went to Furra's tavern. The officers and Furra put some coin wrappers, which were cut to the size of currency, in an envelope, and on that day Furra delivered the envelope to the clerk at the Coliseum Hotel, who placed it in the mail box behind the desk. On that same date Wright rented a room at that hotel, and told the clerk that he was expecting an envelope and asked him to hold it until he returned. The two officers went to the hotel and saw the envelope in the mail box. Then they went into the hotel office and awaited the arrival of Wright. When Wright called for the envelope the manager of the hotel handed it to him, and then the officers took the envelope from Wright.

An officer searched Wright and found a $100 bill in his coat pocket. The serial number of that bill was a number that was on a list of serial numbers which he (the officer) had obtained from Furra. In a conversation with three officers, Wright said he knew why he was arrested; that he had been advised ten years ago to get out of that racket; that he ac-

cepted the $100 bill as one of eleven that he had obtained from Furra; that he alone got the $1,100; that it was "supposedly to fix a horse race," but "Nobody can fix a race"; that he gave a business card, with the name "Joe H. Wright, Stock Farm in Burlingame" on it, to Furra; that the card was fictitious and he had it printed; that he spent the money, which he had obtained from Furra, to pay personal debts, buy clothes, and bet on races.

Allan Gray, a jockey, testified that he was not acquainted with Wright or Chamberlain; that he did not have any conversation with Furra at Wright's request; and that he never received any money from Wright or Chamberlain.

Edward Wright (not the defendant) testified that he was an owner of race horses and that he owned the horse "Exigen" about three years; and that he did not know defendant Wright or Chamberlain; and that he never used a card with the name "J. H. Wright" on it.

The assistant secretary of the California Horse Racing Board testified that Joseph H. Wright had never been licensed by the State Racing Commission.

Furra testified that he relied upon Wright's statement that the $1,100 was to be used in fixing the race; that he parted with the $1,100 in reliance on that statement, "or else I would not have given him eleven hundred dollars"; and that no part of the money was returned to him. On cross-examination he testified that he believed 100 per cent that the race could be fixed; that there was no arrangement to get his money back if the fix did not go through, but if he had not believed Wright he would not have given him the money; that Wright assured him that the horse would win, and he (Furra) believed it or else he would not have given him the money; that when he gave Wright the $1,100 he was not sure that Wright was going to fix the race, but he was taking Wright's word for it; that everything is a gamble to a certain extent, but if "I wasn't sure do you think I would hand anybody $1,100 and let him take off with it"; that he gave Wright the $1,100 because Wright told him that he was going to fix a race; and if he had not been sure that Wright had given him the right information he would not have given him the money. Wright did not testify, and he did not present any evidence.

Appellant asserts that since the title to the money passed to appellant the only type of grand theft allegedly involved here is grand theft by false pretenses. He argues that Furra did not rely upon the representations of appellant. As above

shown, Furra testified that he believed that appellant had given him the right information; that he relied on appellant's statement that the money was to be used in fixing the race and that he would not have parted with the $1,100 if he had not relied on that statement. The evidence was sufficient to support a finding that Furra relied upon the representations of appellant. It is not necessary "that the false pretenses be the sole inducing cause of the owner parting with his money or property. It is sufficient if it had a material influence, although he was also induced by other causes." (*People* v. *Steffner*, 67 Cal.App. 1, 13 [227 P. 690] ; see, also, *People* v. *Chait*, 69 Cal.App.2d 503, 514 [159 P.2d 445].) Appellant also asserts that grand theft by false pretenses was not proven for the further reason that the representations did not relate to a past or existing fact. The statement of appellant to Furra that he, appellant, owned the horse named "Exigen" and various other horses was a representation of an allegedly existing fact. The representation was false, and the jury could have found that the representation was a material factor in inducing Furra to deliver his money to appellant. Appellant told Furra that the money was to be used to fix a race. He (appellant) used it for other purposes, as above shown. He told the officers that he knew a race could not be fixed. The jury could have found that, at the time he obtained the money, he had no present intention of using it to fix a race. If he had no such intention then his representation as to his present intention was a misrepresentation of an allegedly existing fact and was not merely a prediction or opinion regarding a future event. (See *People* v. *Ames*, 61 Cal.App.2d 522, 531-32 [143 P.2d 92].) In *People* v. *Cravens*, 79 Cal.App.2d 658 [180 P.2d 453], it was said at page 664: "The theory has been advanced in two recent decisions that, as in civil actions for fraud, the making of a promise with no intention of performing it or no bona fide belief in its possibility of performance is a false representation of a present fact, i.e., of the state of the promisor's mind." The evidence was sufficient to support a finding of grand theft by false pretenses.

 Also, the evidence was sufficient to support a finding of grand theft by trick and device. In *People* v. *McCabe*, 60 Cal.App.2d 492 [141 P.2d 54], it was said at page 496, that the crime of grand theft by trick and device "usually results when the victim of a fraud intends not to pass complete title to his property but that it shall be applied to a special purpose

while the recipient of the property intends to appropriate it to his own use." Furra, in delivering the money to appellant, intended that the money should be used to fix a race. Appellant, in taking the money, intended to appropriate it to his own use and he did so appropriate it.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.