[Crim. No. 4802. Second Dist., Div. Three. Nov. 6, 1952.]

THE PEOPLE, Respondent, v. JOHN MARK BROWN, Appellant.

William W. Larsen for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was charged with grand theft of $1,800 from Arthur A. Matthews. In a trial by jury he was found guilty. Proceedings were suspended and probation was granted. He appeals from the order granting probation. (See Pen. Code, § 1237, subd. 1.)

Appellant contends that the verdict is against the evidence and the law; that the court erred in giving and failing to give certain instructions; and that it erred in matters of law.

At the time of the alleged offense, February 16, 1950, the appellant, his wife and two children were living with his wife's cousin, Mrs. Wilk, in her home at Puente. They had lived there approximately two months. Appellant's wife testified that they had no money with which to pay Mrs. Wilk for board or lodging. During that time, according to appellant's testimony, his Plymouth automobile was demolished in an accident.

Mr. and Mrs. Matthews and their son Don, who was 21 years of age, resided in Riverside. They had known appellant and his wife about six years. On February 15, 1950, appellant and his wife went to the Matthews home, and appellant told Mr.

Matthews, in the presence of Don, "about" a deal he had for the purchase of wild cattle in Arizona, and he said he needed $1,800.

Mr. Matthews testified that appellant told him the cattle were along the Colorado River south of Topock; appellant drew a map (People's Exhibit 1) and pointed to a place thereon which he said was a ranch; he said the cattle belonged to that rancher, an old man who wanted to get the cattle out of there; he drew a road on the map and said it was a road to the ranch and the cattle—that to go where the cattle were, a person would go 2½ miles east from Topock, then turn south onto a sandy road and go 24 miles to the ranch, which was at the end of the road; appellant said that he had been there, had seen the cattle and estimated there were about 100 cattle; appellant said that he was to pay the rancher 5 cents a pound for the cattle he took out and that the rancher demanded a deposit of $3,000; the appellant said he had $1,200, and he asked Mr. Matthews for $1,800; appellant said that he was to meet the rancher in Los Angeles the next day and he had to put the money up or the rancher would give the deal to someone else; he (Matthews) said that he would think it over and would see appellant the next day.

The next day, February 16th, Mr. Matthews and Don went to the home of Mrs. Wilk and had a further discussion with appellant regarding the cattle. Then appellant, Mr. Matthews and Don went to the office of a notary public. Mr. Matthews testified that the appellant told the notary that they wanted an agreement and the notary typed what appellant said he wanted in the agreement. The said writing (Exhibit 2) was signed by Mr. Matthews and appellant. It was as follows:

"El Monte, California
February 16th 1950

Arthur A. Matthews
9657 Hastings Blvd
Riverside, California

Dear Sir:

"I propose to enter into a project of Buying, Catching, and Selling of Wild Cattle, of any Brands or Marks, within the State of Arizona, and offer you the opportunity of participating in one-half of the profits derived therefrom, with the understanding that you advance me the sum of Eighteen ($1800) hundred Dollars towards the project, it being under-

stood that I have to date put into this deal Twelve Hundred ($1200) Dollars.

"It is understood that this project shall be completed within six months from date hereof, and that all proceeds shall be split 50—50 after the return to you of your $1800, and my $1200, all expenses of this project to be deducted from said settlement.

"Acceptance of the above shall put this agreement into effect.

John Mark Brown
John Mark Brown

"Above fully accepted by me this 16th day of Feb. 1950.

Arthur A. Matthews
Arthur A. Matthews."

After the agreement was signed, appellant, Mr. Matthews and Don returned to the home of Mrs. Wilk. Mr. Matthews gave appellant $1,800 in cash—in $100, $50 and $20 bills. Appellant told him not to discuss the matter with Mrs. Wilk. Then after Mr. Matthews and Don went home, the appellant, according to the testimony of Mrs. Wilk, came into her house, showed her a large roll of bills and said, "That's the kind of a friend to have. He is a grand fellow and he gave me five years to pay it back, which is the best part of it."

The next day, February 17th, appellant purchased a new 1950 Mercury automobile. He made a cash payment of $1,700 on the purchase price. The salesman, who sold the automobile, testified that appellant paid that amount in bills of large denominations—$100, $50 and some $20 bills. Mrs. Wilk's husband testified that the day after appellant purchased the automobile appellant said that a friend let him have some money to buy a new car—that it was a loan to be paid off in five years. About February 21st, appellant went to the Matthews home in the new automobile; thereafter Mr. Matthews did not see appellant until the preliminary hearing (about 16 months later). Mr. Matthews testified that he wrote letters to appellant, addressed to two places in Arizona, which addresses he had obtained from appellant's relatives; he received no reply from appellant, but appellant's wife answered two of the letters.

Mr. Matthews testified further that at the time he gave the $1,800 to appellant he was relying on appellant's statements that the cattle were located 24 miles south of a point 2½ miles

from Topock; that there were 100 cattle and appellant had seen them; that appellant had $1,200 to apply on the deposit; and that appellant could get the cattle for 5 cents a pound.

Don Matthews' testimony, as to the conversations between appellant and his father, was substantially the same as that of his father.

The chief of police of Needles, California, testified that he was acquainted with the territory from Topock south to the Parker Dam; for the past 15 years he had been through it on an average of three times a month; there were no cattle in that territory in 1950.

Another witness testified that he had lived in the vicinity south of Topock from October, 1948, to September, 1950; a Mr. Hunter put 29 head of cattle in there in 1949 and took them out in November of that year; he saw no wild cattle in that territory and heard of none.

An investigator for the district attorney testified that he obtained the map (which appellant had made) from Mr. Matthews and took it to Topock; he proceeded east, following the map, to the point 2½ miles from Topock, then turned south and went 7½ miles to the end of the road, in the mountains, where there is an old abandoned mine; he took photographs of the mine, showing the background and the end of the road.

Appellant testified that in the early part of October, 1949, he met J. T. Gowd in Parker, Arizona; then appellant left Parker and proceeded north to the Bill Williams River where he saw seven or eight bunches of wild cattle; he returned to Parker and made inquiries as to who owned the cattle; Gowd said he had cattle running in there and had a ranch south of Topock; appellant said he would pay him 5 cents a pound for all of the old cattle and 16 cents a pound for cattle less than 3 years old, and they agreed to meet again in Parker in January, 1950; they met at said time and agreed that the deal should go through as planned provided the appellant put up $3,000, and that they would meet again in Los Angeles on February 18th; while returning home, appellant's automobile was demolished; when he talked with Mr. Matthews on February 15th, they discussed catching wild cattle and he (appellant) told him about different bunches of cattle, and he told him about his deal with Gowd; he did not ask Mr. Matthews for money, but Mr. Matthews said he was interested in a deal like that, or anything to make money at that time; appellant told him where Gowd said the ranch was and drew the direc-

tions on the map from information Gowd had given him; appellant had never been there; he told Matthews if the deal worked out "to a profit" they would go farther down the river to other bunches of cattle—the Goulette cattle at Cibola and the Wilson cattle; he told Matthews it would take $3,000, including the cost of grain, groceries and equipment, and that he agreed to give Gowd $2,000 cash as a deposit, and that he (appellant) needed $1,800; on February 16th, they went to the office of the notary public, and he and Matthews told the notary what they wanted; appellant drew the map in the office of the notary after the agreement was signed; after they returned to the Wilk residence, appellant told Matthews not to discuss the matter with Mrs. Wilk; on February 18th, he met Gowd in Los Angeles and Gowd wanted $2,000 in cash paid at that time, but appellant said he would deliver the "$3,000.00" in Topock, and they agreed to meet in Topock within a week or 10 days. Appellant also testified that he agreed to meet Gowd at his ranch; on February 17th, he purchased a Mercury automobile and paid $1,700 cash, with money he got from his father; about eight days later, he went to Topock where he "found just exactly what" the investigator for the district attorney found "according to his maps"; he inquired about Gowd but he did not see him then or thereafter. He testified further that he then went to Corona, California, and talked to Richard Goulette regarding his cattle, and made the same deal with Goulette that he had previously made with Gowd; about March 27th, appellant, his father and Goulette started to chase the cattle, and within about five weeks they caught "between 35 and 42" of them; they repaired an old corral and put the cattle in it; that night he paid Goulette $2,300 cash for the cattle, and Goulette gave him a bill of sale (Exhibit B); the $2,300 was money he got from Matthews and appellant's brother, and part of it was appellant's; the next morning appellant, his father and Goulette went to the corral for the purpose of loading the cattle, but the corral had been torn out and the cattle had gone into the brush; appellant, his father and Goulette worked in the brush about a week longer to get more cattle, but it was too hot and they returned to Yuma; appellant wrote Matthews two letters but received no answer. Appellant also testified that he received two letters from Matthews; he did not answer any letters he received from Matthews but his wife answered about "four" of them. He also testified that when he took the $1,800

he did not intend to use it for his own benefit, and he used no part of it for such purpose.

Richard Goulette testified that in 1950 he owned approximately 75 head of branded cattle in the Cibola Valley; the cattle were wild, and he made a deal with appellant; they corralled about 25 of them, and the appellant paid him $2,300; the next morning the cattle were gone—the corral had been broken; there was no conversation about the $2,300—it was his (Goulette's) money.

Appellant's father testified that he helped appellant and Goulette bring cattle into the pen, and he saw appellant give Goulette some money; the next morning the pen was broken down and the cattle were gone. He also testified that in February, 1950, he lent appellant $2,000 in cash to buy an automobile; he (witness) had "saved it up over a period of time, and I got it from a number of people that I wouldn't know"; he had kept the money in a tin box in his home.

As above stated, appellant contends that the verdict is against the evidence and the law. He asserts that the evidence is insufficient to establish the commission of the crime of theft under any theory. An instruction was given wherein three forms of theft, namely, larceny by trick and device, obtaining property by false pretenses, and embezzlement, were distinguished. The jury was also instructed that if it found that the defendant committed any of the three kinds of theft it would not be necessary to state in the verdict which kind was committed. The verdict stated that defendant was guilty of grand theft, but it did not specify which kind of theft was committed. Appellant argues that a necessary element of grand theft by trick and device was lacking, since the money was not to be applied to a "described purpose." Grand theft by trick and device "usually results when the victim of a fraud intends not to pass complete title to his property but that it shall be applied to a special purpose while the recipient of the property intends to appropriate it to his own use." (*People* v. *McCabe*, 60 Cal.App.2d 492, 496 [141 P.2d 54, 57]; *People* v. *Chamberlain*, 96 Cal.App.2d 178, 182 [214 P.2d 600, 603].) It was stated in *People* v. *Malone*, 20 Cal.App.2d 1, at page 6 [66 P.2d 216, 218], that "[w]hen a person, with intent to defraud, obtains possession of the property of another upon the understanding that it is to be used for a definite object and fails to so use it, such person is guilty of larceny by trick and device." ▮ There was evidence herein from which the jury could have found that Mr.

Matthews was induced to part with his money by false representations of appellant that he had to deposit $3,000 with a Mr. Gowd in order to purchase Gowd's cattle; that Mr. Matthews, in delivering the money to appellant, intended that it be used as part of such deposit; and that the appellant intended to appropriate the money to his own use. The evidence was sufficient to support a finding of grand theft by trick and device.

Appellant also contends that the evidence would not support a conviction of theft under the theory of embezzlement and that the court erred in instructing the jury regarding embezzlement. ██ The question as to the intent with which Mr. Matthews delivered the money to appellant and the intent with which appellant received the money were, of course, questions of fact. ██ It cannot be said, as a matter of law, that the evidence would not support a finding of embezzlement. It was proper for the trial court to define theft and it was not error for it to include a definition of embezzlement.

Appellant contends further that the last paragraph of the instruction regarding the three forms of theft was not "favorable" to him for the reason that it presupposes that a type of theft was committed. That last paragraph was as follows: "However, it is necessary that you all agree as to which of the three types of theft was committed. If you should not be able to do that, the unanimity of decision necessary to warrant a verdict of 'guilty' would be lacking, and it would be improper for you to deliver such a verdict." It is to be noted that the paragraph preceding said last paragraph was as follows: "If you should find that the defendant committed any of the three kinds of theft just mentioned, you should return a verdict of guilty, and it will not be necessary or proper for you to state in your verdict which of the three forms of theft was committed." ██ By those two paragraphs the jury was instructed, in effect, that if it found that defendant committed any of the three kinds of theft, and if it unanimously agreed as to which kind, it should return a verdict of guilty. It was not error to give said instruction.

██ Appellant contends that the court erred in giving the following instruction: "Two classes of evidence are recognized and admitted in courts of justice, upon either or both of which, if adequately convincing, juries may lawfully find an accused guilty of crime. One is direct evidence and the other is circumstantial. . . . Either will support a verdict of guilt if it carries the convincing quality required by law,

as stated in my instructions." Appellant asserts that since "so much of the evidence is circumstantial," the giving of the instruction was prejudicial for the reason that it emphasized the guilt of the accused. He argues in effect that said instruction should also have advised the jury that, upon such evidence, it might find an accused innocent of crime. The jury was instructed further that a "defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal." It was also instructed that it was not permitted, on circumstantial evidence alone, to find the defendant guilty "unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion." It was also instructed that when the case "against a defendant rests entirely or chiefly on circumstantial evidence, and in any case before the jury may find a defendant guilty basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt." In view of all of the instructions which were given, there was no prejudicial error in giving the above quoted instruction regarding direct and circumstantial evidence.

Appellant also contends, as shown above, that the court erred in matters of law. In his argument before the jury, the deputy district attorney stated: "Gowd is what is known in our business as the mysterious stranger. . . . He had a registered brand, apparently registered in the State of Arizona. All he [appellant] had to do was to go to Phoenix or to the county seat of that particular county and find out where this brand was registered." Appellant asserts that the court erred in permitting that statement to stand since there was no evidence in the record regarding the recording of cattle brands. The statement of the deputy district attorney was not improper. According to the law of Arizona, the owner of range livestock is required to adopt and record a brand for such stock. (Ariz. Code Ann., 1939, § 50-315.) Judicial notice may be taken of the law of Arizona. (Code Civ. Proc., § 1875, subd. 3.)

Other contentions of appellant are that the court erred in not giving instructions defining the words "fraud, artifice, trick, device, false token, and false writing"; and in not giving

an instruction that testimony purporting to relate to oral admissions should be viewed with caution. Those contentions are not sustainable. The jury was instructed adequately.

The order is affirmed.

Shinn, P. J., and Vallée, J., concurred.