[Crim. No. 6087. Second Dist., Div. Two. Nov. 9, 1960.]

THE PEOPLE, Respondent, v. ROBERT W. PHILLIPS, Appellant.

§

Ward Sullivan for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

ASHBURN, J.—Robert W. Phillips and Thomas P. Rose were convicted of two counts of grand theft and one count of conspiracy to commit grand theft. Both appealed and presented a joint opening brief. However, on April 14, 1960, this court upon Rose's request dismissed the appeal as to him. We now have before us the appeal of Phillips.

He claims the evidence to be insufficient to sustain the conviction of conspiracy (Count I) or to sustain the convictions of grand theft. (Counts II and III.) The basis of the convictions is the obtaining from one Barz his equity in certain real property through false pretenses. In addition to the attack upon the sufficiency of the evidence appellant Phillips claims error in (1) the court's instruction concerning the responsibility of one who joins an existing conspiracy, (2) error in receiving certain testimony designed to show common plan, scheme and design, and (3) error in refusing certain instructions concerning common scheme and design. We have concluded that appellant's points are not well taken.

So far as sufficiency of the evidence is concerned we must deal with a reporter's transcript of 3,186 pages and briefs aggregating 295 pages. Having found the evidence to be sufficient we are not under obligation to review the same in an effort to convince counsel or others of the soundness of our conclusion. *Pores* v. *Purity Milk Co.*, 135 Cal.App.2d 305, 309 [287 P.2d 169] : ''It is not the province of a reviewing court to comment on each evidentiary conflict or disagreement or to present a detailed argument on the sufficiency of the evidence to support the findings.'' *Sonkin* v. *Hershon*,

130 Cal.App.2d 491, 492 [279 P.2d 156] : "It is not the province of a reviewing court to present a detailed argument on the sufficiency of the evidence to support the findings where it appears that the question is one purely of determining which side shall be believed. The trial court having determined this with the witnesses before it, the controversy is settled." An examination of the testimony and other evidence in the instant case discloses that the findings of the jury have the support of persuasive evidence. We recognize no obligation to set it forth herein. A short statement with respect to each count will suffice and consideration of the conspiracy charge will be postponed until after Counts II and III of the indictment have been discussed.

We have examined the evidence in the light of the rules laid down in *People* v. *Daugherty,* 40 Cal.2d 876 [256 P.2d 911], and many other cases, refraining from a weighing of the proofs or inferences and remembering that " ' "before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground" of insufficiency of the evidence, "it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict." If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. . . .' " (P. 885.)

Count II charges Phillips and Rose with grand theft (Pen. Code, § 487, subd. 1), through inducing Peter Barz and Aurora Barz to part with their equitable interest in real property of a value exceeding $200, which inducement was brought about by false pretenses. Peter Barz owned the Shore Motel representing an investment of $95,000, and advertised it for sale. He thus met appellant Phillips who was engaged in dealing in real estate. Phillips endeavored without success to interest Barz in various properties, including Holiday Motel, an orange grove, a Colorado River ranch, a Russian River resort, a Chinchilla farm and a Clear Lake resort. Finally he offered a three-way deal which Barz accepted and which involved Rex Dettre's obtaining the Shore Motel,

Phillips getting the Clear Lake resort then owned by Dettre, and Barz receiving from Phillips certain trust deeds. An exchange agreement was signed on December 10, 1953. Barz testified: "He [Phillips] said, 'We can make a three-way deal,' he says. 'I can give you some second trust deeds on different property that I got, they are as good as gold.'" "He says, 'Some is going to be on the freezer [Texas Frozen Food] and some on the Hopi House and some on the Holiday Motel.' Well, he said, 'Then I will pick up the best one that I know they will be good for you,' he says, 'leave it to me.'" Submitting a list to Barz, appellant "told me that every building is backed up, the value, very much value, so I don't have to worry about anything." He also said that he would give Barz "about $80,000 worth of second trust deed" on a Texas Frozen Food freezer in Mercedes, Texas, that it was worth a quarter of a million dollars and the equipment and inventory worth about $150,000; that the property was subject only to a $32,000 first mortgage. "Then I told him, I said, 'I've got to have some cash because I spent the last penny I had on the improvement of the motel.' 'Well,' he said, 'I think about the 10th or 15th of January you are going to get $2,000.00—' which I never got. . . . Then he told me, he said, 'Don't worry,' he said, 'I am going to give you the best trust deed so you can get the regular monthly payment which amount should run $600.00 a month, between the different trust deeds.'" Also: "Well, he told me how good a money-maker was that freezer, and I have nothing to worry about because it is good security." An expert appraiser fixed the value of the freezer property in late 1953 and early 1954 at $35,000 to $40,000. The bank balance of Frozen Food on September 15, 1953 was $73.44; on October 1, 1953, $1,329.78; on January 18, 1954, $88.90. On March 31, 1953, and again on October 1, 1953, the indebtedness on the freezer property was reinstated from default. The plant was in run-down condition, the electrical lockers not operating properly, and some of the other machinery at times inoperative. On December 14, 1953, one Kiszak acquired the property and, in addition to existing liens, placed a new trust deed of $45,000 upon it together with another trust deed in favor of Barz for $18,835. Barz received in January 1954 from Phillips two trust deeds on the same property, one for $10,000 and one for $5,190 and eventually the above mentioned $45,000 trust deed. When Barz asked for the whole thing which Phillips had promised, he said: "They are not ready. I am going to give it as soon as

I get them. So, for the time being, take this one.'' Barz never received any money on these trust deeds.

On February 12, 1954, Phillips was informed that the second trust deed on Rancho Motel, upon which he and one Lindemann had a third lien, had been foreclosed. He thereupon asked Barz to come to his office. Barz had previously complained, ''I did not receive any payment which I was supposed to receive on the 1st of January. I did not receive the two thousand dollars that I was supposed to receive on the 10th of January. 'Well,' he said, 'be patient; everything is going to straighten out by itself.' . . . 'Well, I hope so, because I am broke, I have got to have some money.' That was that.'' When Barz arrived on February 13th and asked for the money, Phillips said: '' 'I haven't got the money, but you can get it in a couple of days.' 'On what?' I said to him. He said, 'On the Rancho Motel,' he said. Then I said to him, 'I thought you were going to give me the trust deed on the Hopi.' He said, 'But this is the better,' he said, 'and all you have to do,' he said, 'is just sign this paper that you accept this trust deed. In a couple of days the local bank is going to refinance that motel and you are going to get the full amount what the trust deed calls for.' '' Barz signed, and Phillips said: '' 'In a few days everything will be straightened up, then you are going to get the $10,000.00,' or whatever the amount of the trust deed called for.'' Thereupon Barz took over a $10,000 third trust deed on the Rancho Motel. Upon returning home he found a letter advising him of the fact that the second mortgage on the Rancho Motel had been foreclosed. He telephoned Phillips, saying: '' 'Tomorrow morning I am coming over to your office and see if you can repair it.' I said, 'Up to now I trusted you wholly,' I says, 'but from now on I doubt if you are honest,' and he repeated, he says, 'Come over to the office, maybe we can do something.' '' ''Mr. Phillips told me that there must be some misunderstanding because the local bank was going to refinance and I was going to get my money in full, so to be patient, and that the following day I shall go to his office and he is going to explain it to me more in detail.'' When seen on the following day Phillips ''said there must be some misunderstanding. He said, 'Don't worry,' he says, 'we are going to take care of it and stop the foreclosure and have the thing refinanced.' . . . Then I said to him, 'Well, let's forget the whole thing, and give me the original trust deed that you promised me from the Hopi House.' 'Well,' he said, 'maybe we can work it out.' '' Then

he retired to the next room with his secretary and returning said, "he can do nothing and that is all there is to it. He was going to see what he can do, but everything—he cannot give me the Hopi House trust deed." At this point the stage is set for Count III and the activities of defendant Rose. Barz now has trust deeds on the Texas Frozen Food upon which he has received neither principal nor interest, and his $95,000 Shore Motel is gone.

Barz relied upon the various representations, express and implied, made to him by Phillips. It is not essential that he rely upon them exclusively. "The false pretense or representation must have materially influenced the owner to part with his property, but the false pretense need not be the sole inducing cause." (*People* v. *Ashley*, 42 Cal.2d 246, 259 [267 P.2d 271].) A partial investigation by the victim of false pretenses does not as a matter of law preclude reliance upon them; it merely presents a question of fact for the jury. Barz did make inquiries of the owner of a frozen food locker in Norwalk, California, and received some information from him but such an investigation did not begin to go far enough to discover the truth. The freezer property is in Texas and Barz was in California. (See *People* v. *Robertson*, 167 Cal. App.2d 571, 577-578 [334 P.2d 938]; 35 C.J.S., § 22, p. 664; 23 Cal.Jur.2d, § 37, pp. 90-92.) Moreover, if it were to be said that Barz was "incredibly credulous and greedy, . . . that does not absolve defendant from guilt." "On the criminal side it is recognized that '[t]he guilty party is prosecuted in the interest of the people of the state, and not in the interest of the party defrauded.' (*People* v. *Skidmore*, 123 Cal. 267, 268 [55 P. 984].) Foolish reliance by the victim of a preposterous fraud does not require that one who has violated the statute should go free on that account. 'In determining in cases like the present whether the defrauded party really believed and acted upon the representations of the accused it is proper to consider whether they were of a character to probably induce belief in his mind or in the mind of any person of ordinary intelligence; but the law as it is at this day understood does not make it essential to conviction that the pretenses must have been such as would probably deceive such a person; the guilt of the accused does not depend upon the degree of folly or credulity of the party defrauded; the rule invoked affords no defense against a criminal charge.' " (*People* v. *Gilliam*, 141 Cal.App.2d 749, 751-752 [297 P.2d 468].)

Appellant argues that there is no direct proof that he had knowledge of the falsity of the representations made by him or of his intention to defraud, but direct evidence is not necessary; in many fraud cases these elements can be proved only through circumstantial evidence and that is quite sufficient. (See Witkin on California Evidence, § 157, p. 176; 23 Cal.Jur.2d, § 80, p. 201.) The foregoing résumé of the evidence based upon testimony favorable to respondent's case raises the inferences that Phillips made representations with knowledge of their falsity or in reckless ignorance of what he stated to be facts, and it is immaterial whether it was knowledge or unwarranted ignorance. (*People* v. *Davis,* 112 Cal.App.2d 286, 298 [246 P.2d 160]; *People* v. *Boyd,* 67 Cal.App. 292, 297 [227 P. 783]; *People* v. *Cummings,* 123 Cal. 269, 271 [55 P. 898].) His opinions and promises are aptly described in the following quotation from the Davis case, *supra,* at page 298: "His promises and opinions are equally vicious. The promises were made without intention of performing them and are therefore fraudulent. His opinions were given concomitantly with his statements of fact which gave material support to his opinions expressed to men who were ignorant of the true facts, and were therefore actionable fraud." That is to say, the evidence was such as to warrant the jury in drawing such factual inferences. So far as the proof of the false pretenses depends upon the testimony of Barz, the requirement of section 1110, Penal Code, that it be corroborated by one witness and corroborating circumstances, is satisfied by the production of the circumstantial evidence above mentioned. The finding of guilty on Count II is well supported by the evidence.

Count III. After Phillips told Barz he could not give him the Hopi House trust deed as above related, Barz brought a lawyer, Mr. Fitts, into the situation. He told Phillips, among other things: " 'You'd better do better here with Mr. Barz because everything that is here, I can't make from head to tail.' " Phillips offered " 'to reverse the Clear Lake resort to Mr. Barz.' " Fitts said: " 'Well, at least it is close by, you can go over and look at it, and it will be better than in Texas with all this paper that is not worth the ink it is written on.' " Phillips declared that he had a first mortgage of $30,000 against the resort and was willing to wipe it out and make an exchange for it. "So I told him all the trust deeds I got, I would give him, and he would give me the Clear Lake. . . . Mr. Phillips said he is going to make an

exchange as it is. I was going to give him all the trust deeds back to him and he was going to give me the Clear Lake clear.'' Barz visited the property with Phillips, at which time Phillips said, '' 'we cannot make that deal,' he says, 'We can make a deal on this condition, you assume the $30,000.00 against it plus $5,000.00 for the stock.' . . . The first thing I said, 'You know, I haven't got any money, and in the second place I am not willing to assume another $30,000.00 because that resort was not worth half as much as my motel.' '' Barz refused.

At this point Rose was introduced into the conspiracy (discussed *infra*) as an active participant. About February 19, 1954, Barz called Phillips saying he was worrying because his lawyer and the Merced [Mercedes] bank had told him ''the frozen bank in Merced, was also in foreclosure.'' Phillips opined it could not be as he knew nothing about it. When Barz remarked that he was coming over tomorrow Phillips replied: ''[H]e said, 'you come over there. I got something good for you, some good news for you.' '' When Barz arrived on the 20th Phillips said, '' 'Don't worry, don't worry anything about it, I got a rich man in the next office.' '' ''I says that I was very much worrying about it, worrying about what the lawyer told me, and I said I was so upset I did not want to see my 30 years of hard labor disappear into thin air. And he calmed me down, 'Don't worry,' he says, 'next door in the main office,' he said, 'this man is a millionaire,' he says, 'He is very much interested about your—about the freezer because he used to have a freezer himself, and he wants to make a present to his brother-in-law.' '' Barz was then introduced to Rose who in Phillips' presence made a proposal to exchange Wawona Lodge at Big Bear Lake for the trust deeds held by Barz, saying, '' 'I have got the *motel* so-and-so,' he said, 'I am willing to make an exchange with your trust deeds because I know all about the freezer plant and I want to make a present to my brother-in-law, which he is a butcher by trade.' '' But Barz replied: '' 'I am not interested because I have got my head full already with motel.' '' Later, in April, Barz met with Rose and Dettre in Phillips' office. Phillips said ''that Mr. Rose has got a lodge, Malibu Lodge, which consists of a restaurant and a few cabins, it is a beautiful location, that I should go there and take a look, that it was a going concern. . . . He said that he had a good income and that he hated to part but there was some difference between Mrs. Rose and the present tenants, that they couldn't get together, that is the reason they wanted to get rid of it. . . . I said, 'If it is

so good, I might as well go down there and take a look.'"
Phillips: " 'Let Mr. Barz go and see the lodge.' " Rose told
Barz, referring to Mr. Ryan who ran the Lodge, " 'Don't tell
him that you are going to look at the place or buying any-
thing. Tell him that you are going there to refinance the
place, otherwise he wouldn't receive you good, he wouldn't
give you the information that you need.' " Upon return to
Phillips' office Rose said that he wanted $100,000 for the
Malibu Lodge and when Barz replied that he had only
$90,000 worth of second trust deeds, he said " 'Then we got
to work it out somehow. Have you got any other property you
can put in?' . . . I said that I got a lot in San Clemente, it is
a beautiful lot on the cliff overlooking the ocean, and that I
got $7,000.00 equity on that lot, and that lot was worth over
$10,000.00, but I still owed about $3,000.00.'' Rose also said
"that on the 1st of June I was supposed to get the first
month's rent, $750.00 a month, for the first two years, and
starting after the two years I was going to get $900.00 a
month; and two years after that I was going to get $1,200.00
a month.'' So they made a deal on that basis and the San
Clemente property was acquired by the conspirators. Through
an involved deal in which Phillips actively participated, Rose
had obtained a deed to the Malibu Lodge property from Mrs.
McElroy, the then owner. Barz was taken by Rose to Mr.
Gluskin, the president of Superior Mortgage Company, and
there the manner of refinancing the property was discussed.
Gluskin said he would handle a refinancing which would result
in a $45,000 mortgage on the place, and that " 'That place is
worth it over $200,000.00.' " On April 19, 1954, Rose and
Phillips inspected Barz' San Clemente lot and were told
that it was worth $10,000 but subject to a lien of $3,000.
Phillips said, " 'You are still $3,000.00 short and,' he said,
'the best thing to do,' he says, 'if you want to go ahead with
this deal, you have got to pay to stop the foreclosure on the
Mercedes freezer bank.' Q. In Mercedes, Texas? A. That's
right. 'You have got to stop the foreclosure.' " Also that the
foreclosure would be around $3,200, but all taxes had been
paid and everything cleaned up except the foreclosure. "I
said I haven't got any money. I don't know where to get the
money in such short time because the foreclosure was due
about the end of April and that day was the 19th of April, so
it was two weeks time. 'Well, you have to borrow somehow.'
Q. Who said that? A. I don't remember, Mr. Rose or Mr.
Phillips. I said, 'Well, that is the only thing I can do.' "
Thereupon an agreement was signed by Barz and Rose

whereby the latter was to receive Barz' interest in the Frozen Food bank trust deeds which he was to bring up to date by paying $4,835.10, and Rancho Motel trust deed of $10,000 plus Barz' San Clemente lot, and Barz was to obtain the Rose interest in the $100,000 third trust deed on the Malibu Lodge subject to prior liens of not over $36,000. Barz was also to pay $500 to Phillips. He received a deed to the Malibu Lodge but Gluskin did not refinance the property. Barz sent $4,852 to Texas to stop the foreclosure of the freezer property at Mercedes. He also deeded his San Clemente lot to Rose but the deed was never recorded. On June 4, 1954, Barz not having received the rent due from the Malibu Lodge saw Rose who arranged for Ryan to pay it, so Ryan gave Barz a check dated March 15, 1954, which was returned by the bank marked "account closed." Rose said it was a mistake and he would oust the occupant. So in July Barz moved into the Malibu Lodge, which was not operating. He tried to sell it and took a prospective buyer to Gluskin demanding that he refinance the property as he had promised. Gluskin said he would refinance only after a foreclosure, which ultimately came to pass. When that eventuated, Rose assured Barz he would stop the foreclosure, but did no such thing. And so the story goes on and on with Barz on the losing end of each transaction. Phillips weaves in and out of the Rose-Barz transactions. That the San Clemente lot was thus obtained from Barz by false pretenses clearly appears from the evidence most favorable to respondent, and Count III of the indictment is amply sustained by the evidence.

Count I charges conspiracy between Phillips, Rose, Gluskin, Ryan and others, to commit the crime of grand theft. Overt act number 6 alleged in the indictment is the obtaining of the agreement for exchange of the Shore Motel, and number 11 is obtaining the exchange agreement upon the Malibu Lodge.

"The gist of a criminal conspiracy is a corrupt agreement of two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the objects of the agreement. [Citations.] The existence of the conspiracy may be established by circumstantial evidence. [Citation.] The agreement may be inferred from the acts and conduct of the defendants in mutually carrying out a common purpose in violation of the statute. [Citations.] It is not necessary that the overt acts be criminal. [Citation.] If such acts are done as a step toward the furtherance of the conspiracy they are

244

sufficient. [Citation.] Also the overt act may be performed by any one of the conspirators and yet be sufficient, for the members of the conspiracy are bound by all acts of all members done in furtherance of the agreed plot. [Citations.] Finally, once the conspiracy is established all evidence of the substantive crimes becomes admissible against all participants, even though the other conspirators were not present." (*People* v. *Frankfort,* 114 Cal.App.2d 680, 688-689 [251 P.2d 401].)

 "If in their endeavors to achieve the same end, the defendants pursued a common purpose by their several, respective acts, each contributing his part, the jury is warranted in concluding that all were involved in a conspiracy to effect a common object." (*People* v. *Fratianno,* 132 Cal. App.2d 610, 624 [282 P.2d 1002].)

 It is not necessary that all the alleged conspirators be found guilty, but it is enough that unlawful concert of action on the part of two of them be established. (*People* v. *Calhoun,* 50 Cal.2d 137, 143 [323 P.2d 427]; *People* v. *Gilbert,* 26 Cal.App.2d 1, 26 [78 P.2d 770].) If Rose and Phillips are shown to have been parties to a conspiracy the dismissal of Rose's appeal can have no effect upon Phillips' liability to prosecution and conviction. (*Idem.*) That they did join in such an unlawful concert of action and did pursue it until Barz had been stripped of practically all of his assets is manifest from the evidence outlined *supra* in the discussion of Counts II and III, and Phillips was an active participant from beginning to end. The conviction on Count I is adequately supported.

 Appellant complains of an instruction given to the effect that one who joins an existing conspiracy "is liable for every act, and is bound by the acts and declarations of each and all the conspirators, done or made in pursuance and furtherance of the said conspiracy." (CALJIC Instruction No. 932.) This instruction was held in *People* v. *Weiss,* 50 Cal.2d 535, 563-565 [327 P.2d 527], to be erroneous because it is susceptible of the interpretation of liability for "criminal acts done before the person joining the conspiracy became a party thereto." Respondent agrees that that is the case but argues correctly that it cannot be prejudicial to the sole appellant, Phillips, for he was a party to the conspiracy from the beginning. Rose might have complained of this instruction but when his appeal was dismissed at his request the instruction ceased to have any significance in this court.

Error is claimed in the court's admitting over defendant's objections testimony of certain witnesses concerning false representations made to them similar to those imposed upon Barz by Phillips. Appellant's counsel discusses the matter as if it were solely one of proving other crimes as part of showing a common scheme and design. But the evidence in question was not so limited in content or objective. It consists mainly of representations made to other persons with whom Phillips transacted or attempted real estate deals broadly similar to the Barz deals. This evidence does not fall within the scope of the cited case of *People* v. *Albertson*, 23 Cal.2d 550, 576 [145 P.2d 7], for it does not consist of proof of collateral crimes, merely proof of false representations made to certain witnesses.

"It is settled in this state, however, that except when it shows merely criminal disposition [citations], evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged. 'The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' " (*People* v. *Peete*, 28 Cal.2d 306, 314 [169 P.2d 924].) Fricke on Criminal Evidence (5th ed.), page 289: "In a prosecution for theft by false pretenses proof of false representations and pretenses made to other persons and similar to those made to the complaining witness are admissible to furnish the corroboration required by law in such cases (*People* v. *Brecker*, 20 Cal.App. 205 [127 P. 666]; *People* v. *Whalen*, 154 Cal. 472 [98 P. 194]; *People* v. *La France*, 28 Cal.App.2d 152 [82 P.2d 465]) and, as will be seen in the discussion of those subjects, is generally admissible to prove intent or knowledge or both knowledge and intent." Witkin on California Evidence, section 136, page 158: "And the cases illustrating the exceptions are so much more numerous than those applying the exclusionary rule that it has been suggested that the true rule could be more realistically stated in affirmative form: That evidence of other crimes is admissible whenever it is relevant to a material issue, and that it should be excluded only where its sole purpose and effect is to show the defendant's bad moral character (disposi-

tion to commit crime). (See *People* v. *Peete* (1946), 28 C.2d 306, 314, 169 P.2d 924; *People* v. *McMonigle* (1947), 29 C.2d 730, 742, 177 P.2d 745; 13 So.Cal.L.Rev. 511; 22 So.Cal.L. Rev. 345.)'' See also *People* v. *Weitz*, 42 Cal.2d 338, 347 [267 P.2d 295]; *People* v. *Gordon*, 71 Cal.App.2d 606, 632 [163 P.2d 110]; *People* v. *Whiteside*, 58 Cal.App.2d 33, 38 [208 P. 132]; *People* v. *Shalhoob*, 147 Cal.App.2d 455, 458-459 [305 P.2d 264]; *People* v. *Wardwell*, 167 Cal.App.2d 560, 563 [334 P.2d 641].

 The foregoing remarks apply to the evidence of Elizabeth K. Jones, Helen Beilsten and Daisy Storms. That of Fred Packard relates only to uncompleted deals between the witness and Phillips and is entirely innocuous. John Halberg merely testified to his appraisal of the Lake Wood Resort, which testimony does not remotely fall within the Albertson doctrine.

 Finally, complaint is made of the court's refusal to give two proffered instructions concerning proof of other offenses. The following instruction, modeled on CALJIC 33, was given: ''Evidence was offered in this case for the purpose of showing that the defendants made similar representations concerning the properties which are the subjects of the grand theft counts in this indictment. This evidence [was] presented by the witnesses, George D. Elliott, Fred M. Packard, Elizabeth K. Jones, Helen Beilsten, John Holberg, and Sergeant Daisy Storms.

''Such evidence was received for a limited purpose only: not to prove distinctive offenses or continual criminality, but for such bearing, if any, as it might have on the question whether the defendants are innocent or guilty of the crimes charged against them in this action. You are not permitted to consider that evidence for any other purpose, and as to that purpose you must weigh such evidence as you do all other in the case.

''The value, if any, of such evidence depends on whether or not it tends to show that there existed in the minds of the defendants a plan, scheme, system or design into which fitted the commission of the offenses for which they are on trial.''

This covers the subject of defendant's requested instructions as far as they correctly state the law. However, both were properly refused because they contain improper versions of the governing rule. Specifically, one of them, number 27, contains the following language: ''Before you can consider such evidence for any purpose, you must find that the trans-

action or transactions were in fact similar to the particular transactions involved in the charge in one or more counts of the indictment and then only to the particular transaction or transactions in the particular count or counts involved.'' The other, number ——: ''The court instructs the jury that, before you may consider evidence of transactions other than those involved in the charges contained in the indictment upon the question of a common plan or scheme, you must find that such transaction or transactions were part of a common plan or scheme directly connected with the transaction or transactions involved in the said charges.''

The authorities above quoted and cited establish the erroneous nature of the restrictions contained in these passages. There was no error in the refusal of the said proposed instructions.

The appeal is taken from the ''judgment and sentence'' which are one, constituting the judgment. (*People* v. *Perkins,* 147 Cal.App.2d 793, 797 [305 P.2d 932] ; *People* v. *Cruz,* 178 Cal.App.2d 83, 88 [2 Cal.Rptr. 868].)

The judgment is affirmed.

Fox, P. J., and Nourse, J. pro. tem.,* concurred.

A petition for a rehearing was denied December 6, 1960.

*Assigned by Chairman of Judicial Council.