[No. C017764. Third Dist. July 18, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
THEODORE CHARLES WHIGHT, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

**COUNSEL**

Eileen S. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Shirley

A. Nelson and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SPARKS, Acting P. J.**—Defendant Theodore Whight discovered that the automated teller machine (ATM) card connected to his defunct checking account could still be used to obtain cash at four local Safeway stores. For several weeks he availed himself freely of this happenstance to obtain thousands of dollars. This led to his conviction by a jury of four counts of fraudulent use of an access card or "ATM" theft (Pen. Code, § 484g; undesignated references are to this code) and four counts of grand theft by false pretenses (§§ 484, subd. (a), 487, 532). In a bench trial, the court found true the allegation that defendant had served a prior prison term. (§ 667.5, subd. (b).) Defendant was sentenced to state prison for a total unstayed term of six years.[1] The court also imposed a $500 restitution fine and ordered $19,460 in restitution to be paid to Safeway pursuant to Government Code former section 13967, subdivision (c).

We consider two questions in the published portion of this opinion. The first is whether Safeway relied upon defendant's misrepresentations within the meaning of the crime of grand theft by false pretenses. Defendant was able to obtain large amounts of cash from the Safeway stores because the computer verification system was not working properly. Defendant contends that the only misrepresentation he made was that his ATM was valid and Safeway did not rely on this but rather upon the computer authorization. For the reasons which follow, we reject the claim.

The second relates to the ATM convictions. Defendant contends his convictions for ATM theft are fatally flawed because the evidence is insufficient to establish that the bank gave written notice of the revocation of his ATM card. We agree and therefore reverse the convictions for ATM theft.

In the unpublished portion of the opinion, we consider and reject defendant's claim that only one crime of grand theft by false pretenses was committed because there was only one victim. Thus, we will affirm the four

---

[1]The court designated count one, a violation of section 484g, as the principal term and imposed the upper term of three years for that offense. It then imposed upper terms of three years on the remaining three ATM convictions, and ordered them to run consecutively to the principal term as subordinate terms of eight months each. (See § 1170.1, subd. (a).) This added two years to the total term. In addition, the court imposed a one-year term for the prior prison term. (§ 667.5, subd. (b).) Finally, the court imposed the upper term of three years on each of four grand theft counts but ordered them stayed pursuant to section 654.

convictions for grand theft by false pretenses. In that unpublished portion we also hold that the $500 restitution fine was improperly imposed but reject defendant's remaining sentencing contentions.

## THE CRIMES

Defendant opened a regular checking account at Tri Counties Bank (the bank) in Chico in January 1991. He was issued an ATM card which bore no expiration date. This card did not offer any overdraft protection and could be used only with the checking account. Thereafter, monthly statements for his checking account were sent to defendant by the bank at his post office box. Defendant originally deposited $3,750.99 into his checking account. By June 1991 defendant's account was overdrawn by $6.17. In accordance with the bank's normal practice, defendant was mailed a letter stating that his account was overdrawn, that his bank statement and canceled checks would be held at the bank and if no deposits were made to cover the shortage, the account would be closed. As a bank employee explained it, the letter advised defendant that "if a deposit is not made the account will be closed before the next statement date. Please contact customer service, and it lists a phone number. We enclosed with this same, this letter, letting the customer know that the account will be closed if a deposit is not made to bring the account either to a zero balance to close it or to a positive balance to keep it open." On July 10, 1991, no deposit having been made, the bank closed the account because of the negative balance. From the bank's viewpoint, when defendant's checking account was closed, his ATM card was simultaneously canceled and revoked.

Despite the cancellation by the bank, defendant continued to use his ATM card, mainly at local Safeway markets. Safeway allows customers to make purchases and receive cash back by using ATM cards. Safeway's practice was to verify the cards through the use of a computer system operated by Wells Fargo Bank (Wells Fargo). Wells Fargo would report a code to Safeway which approved or disapproved of the proposed transaction. In some cases Wells Fargo would not be able to link up with the customer's bank or otherwise verify the card. If this lasted for more than about 30 seconds, Wells Fargo would report a "stand in" code to Safeway. Upon receipt of this code, Safeway would approve the transaction.

It appears that there was an error in the Wells Fargo computer, which repeatedly failed to notify Safeway that defendant's ATM card was invalid. In March and April 1992, defendant was able to use his ATM card at four different Safeway markets in Butte County. He would purchase a small item, then use his ATM card to pay for the item and to receive cash back, usually

$200 at a time, often more than once a day. He received a total of over $19,000. During that time his ATM card was rejected at two other (non-Safeway) markets.

Typically, defendant went to the Safeway stores at differing hours and when he used his card he did so quickly and attempted to conceal it from the view of the store employees. At the time of his arrest, defendant admitted knowing his checking account was closed. A search of his residence revealed Safeway receipts detailing the ATM transactions, a checkbook which did not contain any recent notations and over $5,000 in cash.

Defendant did not testify, but after his arrest he told an interrogating officer he had an open account with the bank and that in January 1992, he deposited $50,000 in the account, but could not say where he obtained those funds. He believed a computer "hacker" employed by Safeway had altered his account balance. Not surprisingly, the jury rejected this secondhand explanation and convicted defendant of all the charges.

## DISCUSSION

### I. ATM Thefts

Defendant first contends the evidence is insufficient to establish that he received adequate notice that his ATM card had been revoked. We agree.

The second amended information charged defendant with four counts of violating section 484g, commonly referred to as "ATM card theft."[2] It alleged that defendant "with intent to defraud use[d] an access card which [he] knew was forged, expired and revoked for the purpose of obtaining money, goods, services and anything else of value." Despite this catch-all pleading, defendant's card was neither expired (see § 484d, subd. (3)) nor forged. Instead, the People's sole theory at trial was that defendant's ATM card had been "revoked" and the jury was instructed only on this component of the crime.

---

[2]At the time of defendant's offenses, section 484g provided: "Every person, who with intent to defraud (a) uses for the purpose of obtaining money, goods, services or anything else of value an access card obtained or retained in violation of section 484e or an access card which he or she knows is forged, expired, or revoked, or (b) obtains money, goods, services or anything else of value by representing without the consent of the cardholder that he or she is the holder of an access card and the card has not in fact been issued, is guilty of theft. If the value of all money, goods, services and other things of value obtained in violation of this section exceeds four hundred dollars ($400) in any consecutive six-month period, then the same shall constitute grand theft." (Stats. 1986, ch. 1436, § 3, pp. 5137-5138.) The statute has since been amended to add the phrase "or access card account information altered," as well as the phrase "or 484f." (Stats. 1994, First Ex. Sess., 1993-1994, ch. 59, § 3.)

The statute contains a special, technical definition of the term "revoked." " 'Revoked access card' means an access card which is no longer authorized for use by the issuer, that authorization having been suspended or terminated *and written notice thereof having been given to the cardholder*." (§ 484d, subd. (7), italics added.) The emphasized portion of the statute requires that the issuer give written notice to the cardholder that authorization to use the card has been suspended or terminated.

Here the uncontradicted evidence established that the bank sent only a warning letter threatening to close the account. The bank later closed the account and canceled the card. But no evidence was adduced showing that the bank ever gave written notice to defendant that either his card had been suspended or terminated or that his checking account had been closed. Struggling with the issue, the Attorney General suggests that it is "a reasonable inference that [defendant] was sent the closing statement, like all previous account statements, by Tri Counties Bank in the regular course of business." But there was no evidence that the bank, in the regular course of its business, sent statements to depositors after their accounts had been closed. Even more damaging to the prosecution, there is no evidence that a monthly checking account statement would say anything about the ATM card, much less that its use had been suspended or terminated.

In order to prove the type of ATM theft charged in this case, the prosecution was required to prove that defendant used the card knowing it had been revoked. For purpose of this crime, a card is revoked if, and only if, the issuer has (1) suspended or terminated its use, and (2) "written notice thereof [has] been given to the cardholder." (§ 484d, subd. (7).) Because there is no evidence that the bank gave written notice to defendant that the ATM card had been suspended or terminated, the convictions for violation of section 484g cannot stand.[3]

## II. *False Pretenses*

■ Defendant next contends his convictions for grand theft by false pretense must be reversed because "Safeway relied on the code issued by Wells Fargo, rather than [defendant's] presentation of his ATM card, in approving [defendant's] request for money." This leaky contention cannot hold water.

---

[3]In light of our conclusion that the evidence is insufficient to prove an ATM theft, we have no occasion to consider defendant's alternate contention that these ATM convictions must be reversed because the trial court instructed the jury on the presumption of receipt of mail (see Evid. Code, § 641), thus impermissively lightening the prosecutor's burden of proof. (See *Carella* v. *California* (1989) 491 U.S. 263 [105 L.Ed.2d 218, 109 S.Ct. 2419], and *People* v. *Colantuono* (1994) 7 Cal.4th 206, 221 [26 Cal.Rptr.2d 908, 865 P.2d 704].)

Theft by false pretenses is committed by "[e]very person who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of money, labor, or property, whether real or personal, . . ." (§ 532, subd. (a).)[4]

██ "To support a conviction of theft for obtaining property by false pretenses, it must be shown: (1) that the defendant made a false pretense or representation, (2) that the representation was made with intent to defraud the owner of his property, and (3) that the owner was in fact defrauded in that he parted with his property in reliance upon the representation." (*Perry* v. *Superior Court* (1962) 57 Cal.2d 276, 282-283 [19 Cal.Rptr. 1, 368 P.2d 529]; see also *People* v. *Fujita* (1974) 43 Cal.App.3d 454, 467 [117 Cal.Rptr. 757]; 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Property, § 602(3), p. 681; Fricke & Alarcon, Cal. Criminal Law (10th ed. 1970) Larceny—False Pretenses, p. 293.) We are here concerned with causation or reliance.

The representation need not be in the form of an oral or written statement; it may also consist of conduct. "The false pretense may consist in any act, word, symbol, or token calculated and intended to deceive. It may be either express or implied from words or conduct." (*People* v. *Randono* (1973) 32 Cal.App.3d 164, 174 [108 Cal.Rptr. 326].) ██ Thus, when defendant proffered his ATM card he impliedly represented, falsely, that it was valid. (See *People* v. *Ali* (1967) 66 Cal.2d 277, 281 [57 Cal.Rptr. 348, 424 P.2d 932]; *Blackledge* v. *United States* (D.C.App. 1982) 447 A.2d 46, 51-52. See also Comment (1960) 48 Cal.L.Rev. 459, 491.) ██ Reliance on a false representation may be, and in some cases must be, inferred from the evidence. (*Perry* v. *Superior Court, supra,* 57 Cal.2d at p. 285; *People* v. *Hong Quin Moon* (1891) 92 Cal. 41, 42 [27 P. 1096].) However, if the evidence establishes that the victim did not rely on the false pretense, a conviction cannot stand. ██ Defendant maintains that because the Safeway employees did not merely hand him cash upon presentation of the card, but instead verified the card through the computer system, Safeway did not actually rely on his implied representation and therefore he did not commit the crime of theft by false pretenses. In short, he urges there was no substantial evidence of the reliance element of the crime.

██ It is true that "[f]or false pretenses it is necessary that the swindler's misrepresentation *cause* the victim to pass title to his property or money to

---

[4]This definition is repeated in section 484, subdivision (a), defining the acts constituting theft. Under this definition and as relevant here, "[e]very person . . . who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, . . . is guilty of theft." Theft by false pretenses is grand or petty theft depending on the value or kind of property obtained. (§§ 484, subd. (a), 532.)

the swindler. Looking at the matter from the point of view of the victim, the same thought may be expressed thus: for false pretenses it is required that the victim pass title to his property *in reliance upon* the swindler's misrepresentation." (2 LaFave & Scott, Substantive Criminal Law (1986) False Pretenses, § 8.7(c), pp. 390-391, italics in original and fn. omitted.) Thus, "[e]ven though a false representation is made and property obtained by the person making the representation, no prosecution will lie where the complainant parted with his property to the accused from some cause other than such false representation since to constitute this offense the representation must have been a material element in proximately causing the complainant to part with his property and without which he would not have done so. . . ." (Fricke & Alarcon, *op. cit. supra*, p. 295, citations omitted; see also 2 Witkin & Epstein, Cal. Criminal Law, *supra*, Crimes Against Property, § 612, at p. 695.) Consequently, "[i]f the owner did not rely on the false pretense in parting with his property, then a conviction cannot be sustained." (*People* v. *Smith* (1984) 155 Cal.App.3d 1103, 1149 [203 Cal.Rptr. 196]; see also Note, *Attempted Grand Theft by False Pretense Where Victim Is Not Deceived* (1960) 33 So.Cal.L.Rev. 227; Annot., False Pretense—Attempts (1966) 6 A.L.R.3d 241; Annot., False Pretense—Failure to Deceive (1934) 89 A.L.R. 342.)

As Witkin and Epstein note, the reliance or causation element of the crime may be found lacking in three typical situations: "(1) Where the complainant knew the representation was false, or did not believe it to be true. [Citation.] [¶] (2) Where, even if he believed it, he did not rely on it, but investigated for himself or sought and relied on other advice. [Citations.] [¶] (3) Where, although some false representations are proved, the complainant parted with his money or property for other reasons or in reliance on other representations not shown to be false." (2 Witkin & Epstein, *op. cit. supra*, § 612, at p. 696)

But it is settled, as the Attorney General points out, that the false pretense need not be the sole reason for the victim to part with his money or property. "The false pretense or representation must have materially influenced the owner to part with his property, but the false pretense need not be the sole inducing cause." (*People* v. *Ashley* (1954) 42 Cal.2d 246, 259 [267 P.2d 271], citing *People* v. *Chamberlain* (1950) 96 Cal.App.2d 178, 182 [214 P.2d 600]. See *Perry* v. *Superior Court, supra*, 57 Cal.2d at pp. 285-286; *People* v. *Steffner* (1924) 67 Cal.App. 1, 13 [227 P. 690].)

It is also settled that the victim need not investigate. "The party so deceived is none the less defrauded of his money [although] he might have made an investigation and determined that the representations were false."

(*People* v. *Smith* (1906) 3 Cal.App. 62, 65 [84 P. 449].) But the rule is equally well established that, where the victim does investigate the representation and relies solely on his investigation rather than upon defendant's representation, the crime of theft by false pretenses is not made out.[5] (See, e.g., *People* v. *Gibbs* (1893) 98 Cal. 661, 663 [33 P. 630]; *People* v. *Frankfort* (1952) 114 Cal.App.2d 680, 699 [251 P.2d 401]. See also *People* v. *Miles* (1940) 37 Cal.App.2d 373, 377-378 [99 P.2d 551] [evidence of investigation by victim should not have been excluded], disapproved on other grounds in *People* v. *Bailey* (1961) 55 Cal.2d 514, 520 [11 Cal.Rptr. 543, 360 P.2d 39]; *People* v. *Daniels* (1923) 64 Cal.App. 514, 517-518 [222 P. 387] [same].)

A classic example of nonreliance after investigation by the victim is recounted in *People* v. *Daniels*, *supra*, 64 Cal.App. 514: " 'The prisoner offered a chain in pledge to a pawnbroker, falsely and fraudulently stating that it was a silver chain, whereas in fact it was not silver, but was made of a composition worth about a farthing an ounce. The pawnbroker tested the chain, and finding it withstood the test, he, relying on his own examination and test of the chain, and not placing any reliance upon the prisoner's statement, lent the prisoner 10 shillings, the sum he asked, and took the chain as a pledge. It was held, that if the money had been obtained on the statement made by the prisoner, he might have been convicted of obtaining it by false pretenses; but that, as the [pawnbroker] relied entirely upon his own examination, and not upon the false statement, the prisoner was properly found guilty of only an attempt to commit that offense.' " (At p. 518, quoting Wharton's Criminal Law (11th ed.) § 1442; see also *People* v. *Gibbs*, *supra*, 98 Cal. at p. 663 [reliance on attorney's advice rather than defendant's representation].)

On the other hand, the causal chain of reliance is not broken merely because the victim undertakes some investigation. So long as the victim does not rely solely upon his own investigation, sufficient reliance is shown if the victim relied in part upon the defendant's representations. Thus, for example, in *People* v. *Phillips* (1960) 186 Cal.App.2d 231 [8 Cal.Rptr. 830], the

---

[5]These rules are embodied in CALJIC No. 14.11, which was given in this case: "In order for [a] false pretense or representation to be material in inducing an owner to part with property with intent to divest him or herself of title, the owner must rely wholly or in part on that pretense or representation, and he or she must act in that reliance. [¶] An owner of money is under no duty to make an investigation and [has] the right to rely on the pretense or other representation made to him or her, however *if before transferring property to another, he or she does make independent inquiry or investigation and relies on such inquiry or investigation rather than on any pretense or representation made to him or her by the other person or when for any reason the owner does not rely on any false pretense or representation made to him or her by the other person, the latter is not guilty of obtaining said property by false pretense or representation.*" (Italics added.)

defendant, in a property exchange deal, stated that he would give the victim a second trust deed falsely represented to be worth about $80,000 on a frozen food freezer business in Texas worth a quarter of a million dollars. "A partial investigation by the victim of false pretenses," the *Phillips* court ruled, "does not as a matter of law preclude reliance upon them; it merely presents a question of fact for the jury. [The victim] did make inquiries of the owner of a frozen food locker in Norwalk, California, and received some information from him but such an investigation did not begin to go far enough to discover the truth. The freezer property is in Texas and [the victim] was in California." (*Id.* at p. 239.) Because it was not essential that the victim rely exclusively on defendant's representations, the victim's investigative efforts, such as they were, did not undermine the false pretenses conviction. (*Ibid.*)

Similarly, in *People* v. *Robertson* (1959) 167 Cal.App.2d 571 [334 P.2d 938], the defendant obtained credit with various businesses after making false representations with respect to his bank account, his own business and his listing with Dun and Bradstreet. Based on these misrepresentations, defendant obtained merchandise from the victims. (*Id.* at pp. 577-578.) As to one of the defrauded businesses, defendant claimed there had been no reliance because "some credit check was made through Dunn [*sic*] and Bradstreet before credit was extended." (*Id.* at p. 577.) The *Robertson* court rejected the claim because the record revealed that "reliance was also placed upon other representations in [defendant's] application, including his statement that he was a doctor of osteopathy." (Pp. 577-578.)

 Defendant claims that Safeway relied upon the computer authorization rather than upon his implicit representation that his card was valid. Whether Safeway relied exclusively on the computer authorization would ordinarily pose a factual question to be resolved by the jury under proper instructions. (*People* v. *Phillips, supra,* 186 Cal.App.2d at p. 239.) But in this case the record conclusively established that Safeway did not rely upon any computer authorization from Wells Fargo.

The ATM terminals in the Safeway stores were connected to a computer system operated by Wells Fargo. When a customer uses his ATM card in the ATM terminal at a checkstand in a Safeway store by swiping it through the terminal, the magnetic stripe on the back of the card is read. This information is then sent by modem via telephone lines to computers at Wells Fargo. These computers then pass the information to a banking network. As a banking supervisor for Safeway described it, the information "goes from that network to the card holder's bank for an authorization. If the money's in the account, the bank approves it, comes back in through the network, through

our bank and back to the store." For the most part, the system generates a code either approving or disapproving the transaction. If approved, the transaction is consummated. On the other hand, if the transaction is denied, the screen at checkstand states, "transaction declined" and sale and/or request for cash would be refused.

In addition to codes for approval and disapproval, the system generates what are called "stand-in" codes. Two types of "stand-in" codes were described by the banking supervisor. "First one being if any place along that network, that phone path that I have described may be down, the phone line may not be operational at any given point in time. That's one type. [¶] The other type where Safeway will stand in is if we don't get that authorization or that response through the system in a reasonable amount of time, then we will stand in for that transaction." Safeway would then automatically resubmit the transaction at a later time for approval. Thus, a "stand-in" code meant that either Safeway could not make connection with the Wells Fargo Bank computers or Wells Fargo could not make connection with the bank it sought approval from. In short, a "stand-in" code simply tells the Safeway store that there has been no response to its request for authorization. In these circumstances, as a Safeway accountant explained it, Safeway "management has elected to take stand-in. They will do it after approximately 25 to 30 seconds. If the card is a card from an approved bank, from a bank that Safeway deals with, we will accept the card in stand-in, management made that decision, and then the system will keep trying to connect to the bank and then get the approval for the card and get the money from the person's account, but after 25 or 30 seconds, we will take the card and give the person the money for it rather than holding the customer up and making them stand there and wait." This corporate decision was reiterated by Safeway's banking supervisor. "Again, it's for customer service. We feel that just because our system may not be available at a given point in time or that we don't get a response within a few seconds, that we will ultimately get an authorization and approval for those transactions, so we take the risk on stand-in transactions."

As it turned out, there was a glitch in Wells Fargo's system concerning defendant's account. Rather than transmitting a code declining the transaction because defendant's account had been closed, Wells Fargo kept returning a code to Safeway indicating that there was no response. This, in turn, caused Safeway to treat each transaction as a "stand-in" without a verification or approval from the computer banking system. Given these facts, it can hardly be said that Safeway relied upon the Well Fargo's computer system instead of defendant's representation that his card was valid. Even assuming that the use of a computer verification system can be described as an

investigation, the computer system in fact never approved defendant's transactions. As a result, Safeway had nothing to rely upon except defendant's implicit representation that his ATM card was valid. It elected to take the risk and to rely solely on defendant's representation. On this record, the element of reliance or causation was indisputably established.

### III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The four convictions for ATM theft in violation of section 484g as charged in counts 1, 2, 3 and 4 of the second amended information are reversed. The $500 restitution fine imposed under Government Code, former section 13967, subdivision (a), is stricken. In all other respects, the judgment is affirmed. The cause is remanded to the trial court with directions to resentence defendant in light of this disposition.

Davis, J., and Morrison, J., concurred.

A petition for a rehearing was denied August 11, 1995.

---

*See footnote, *ante*, page 1143.