Filed 4/10/13  P. v. Shekell CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JEFF SHEKELL,<br><br>    Defendant and Appellant. | D059520<br><br><br>(Super. Ct. No. SCD214526) |

APPEAL from a judgment of the Superior Court of San Diego County, Francis M. Devaney, Judge. Affirmed.

A jury found Jeff Shekell, who operated an automobile repair business in El Cajon, guilty of (1) petty theft of personal property (Pen. Code, § 484) (undesignated statutory references will be to the Penal Code unless otherwise specified) as a lesser included offense of grand theft of personal property (count 2; victim: Terry Guishard); (2) grand theft of personal property (count 4: § 487, subd. (a) (hereafter § 487(a)); victim: Alan Sup); and (3) attempted grand theft of personal property (count 5: §§ 487(a), 664;

victim: Tony Gallo).  At the sentencing hearing, the court placed Shekell on five years formal probation.

Shekell raises three contentions on appeal.  First, he contends the evidence is insufficient to support his theft convictions because the prosecution alleged he committed theft by false pretenses, but there is no evidence he "misrepresented a single thing regarding his repair of the three vehicles involved," and all of the work he did "was done with the full approval of the customers."  Second, he claims his convictions under the "broader" theft statutes are barred because the prosecution presented no evidence he defrauded his customers, and, thus, his conduct is covered only by more specific statutes codified in the Business and Professions Code, violations of which are punishable only as misdemeanors.  Third, Shekell contends the court violated his federal constitutional right to due process by erroneously admitting inadmissible "bad character" evidence, and his trial counsel's failure to object to that evidence amounted to ineffective assistance of counsel.  We affirm the judgment.

FACTUAL BACKGROUND

A.  *The People's Case*

Eugene Kendall, a program representative employed by the State Bureau of Automotive Repair (BAR) which regulates the automotive repair industry under the Automotive Repair Act[1] (hereafter the Act), explained that automobile repair dealers (hereafter repair shops) in California cannot lawfully operate unless they are registered

---

[1]     Business and Professions Code section 9880 et seq.; see 10 Witkin, Summary of California Law (10th ed. 2005), Sales, section 332, pages 308-309.

with (i.e., licensed by) the BAR. Unlike repair shops, individual general mechanics are not subject to a registration or licensing requirement under state law. Kendall explained that under the Act a repair shop is required to give the customer a written estimate with a specific price for specific work to be done, and the customer must authorize that work before any work is done on the customer's vehicle. The Act requires that the repair shop call the customer when additional work at a cost beyond the original estimate is needed. The customer must give approval, which must be documented on the work order.

Kendall also explained that the Act authorizes two types of diagnostic estimates for the repair of a vehicle. A simple diagnosis estimate can be done by simply writing down "check vehicle" or "perform diagnostic," specifying a price, getting the customer's signature, and giving a copy of the estimate to the customer; but the repair shop must perform the diagnosis for the specified price. A teardown estimate is a specific price for taking apart a particular vehicle component, inspecting it, and preparing a written estimate to repair the vehicle. After receiving the repair estimate, the customer can either authorize the repair work or decline it, but if the customer declines the work the repair shop must reassemble the vehicle and return it to the customer in the same condition it was in when the customer brought it into the shop.

Shekell operated a repair shop known as JSA Automotive & Off Road Center (JSA) in El Cajon, California. Kendall testified that as of December 2, 2005—when he went to the shop, accompanied by some coworkers and a California Highway Patrol (CHP) officer, as part of an investigation to determine whether Shekell was operating without a license—Shekell's shop was no longer licensed to operate. On that date,

3

Kendall asked for Shekell's automotive repair dealer license that was posted in his shop, and Shekell gave it to him. Kendall testified that Shekell's repair shop then should have been closed and should not have continued working on cars for the public because it was no longer licensed. However, Shekell continued to operate his unlicensed repair shop from that date (December 2, 2005) through 2007.

In April 2006 Shekell began displaying to the public, in his unlicensed repair shop, the license of Any Transmissions Auto Repair, the repair shop business of Ruben Ramirez Navarro (Ramirez), who was renting space in Shekell's shop in April 2006. Shekell created invoice forms that Ramirez used at Shekell's repair shop. Shekell kept those invoice forms, and Ramirez had to ask Shekell for the forms when he needed them.

Ramirez testified that when he left Shekell's shop in June 2006 to work elsewhere, Shekell continued to display his (Ramirez's) BAR license, and Shekell did not return it to Ramirez until May or June of 2007 after Ramirez made several requests that he do so. Ramirez stated he did not work on Guishard's Ford Ranger, he did not write an invoice for Guishard's Ford Ranger, and he did not give Shekell permission to use his invoice form to write up a business transaction with Guishard. Ramirez also testified that Shekell asked him to tell Kendall that he (Ramirez) did work on Guishard's Ford Ranger.

*Count 2*

Terry Guishard, the victim of the petty theft offense of which Shekell was convicted in this matter, testified that he took a Ford Ranger truck to Shekell's repair shop in June 2006. At the time, Guishard believed Shekell's shop was licensed. Guishard told Shekell that a lift kit had been installed on the vehicle, and there was a vibration in the

4

rear end that he wanted repaired. Guishard gave Shekell a cash deposit of either $50 or $100, and Shekell gave him a two-page invoice receipt in the name of Any Transmissions Auto Repair. Guishard testified he was not dealing with that business at that time. He also stated that in exchange for the deposit, he anticipated that Shekell would look at the vehicle and call him later to tell him what the problem was. Guishard did not authorize any repair work.

Shekell called Guishard that afternoon, informed Guishard he had already performed work on the vehicle at a cost of $270 and asked for his permission to replace the center support bearing at a total cost of $600. Guishard authorized the repair work. When Guishard picked up his truck at 5:00 p.m., Shekell told him the truck was "better," and Guishard paid the balance with a check payable to Shekell's repair shop, JSA. Guishard discovered the vibration problem had not been fixed and testified that he canceled the check because he thought he had been "unjustly charged."

Sometime later Guishard purchased a new axle from Shekell for $280. Guishard gave Shekell the old axle to return to the manufacturer for a refund under a lifetime warranty, and Shekell agreed to give Guishard the refund less the cost of shipping it to the manufacturer, about $175. Shekell never gave Guishard the refund.

On June 12, 2006, Kendall from BAR contacted Shekell and asked to see all of the paperwork on the Guishard transactions. Kendall testified that Shekell refused to give him any records, denied doing any work for Guishard, and told Kendall to ask Ramirez for the paperwork because it was "[Ramirez's] job."

5

*Count 4*

Alan Sup, the victim of the grand theft offense of which Shekell was convicted, testified he began talking to Shekell in 2002 about replacing the engine in his 1984 El Camino. Shekell gave Sup a detailed estimate in the amount of $1,500, including parts and labor. Sup later purchased an engine and transmission, and, in 2002 or 2003, Shekell orally told Sup he would charge $5,000 to install them. Sup saved his money and took his El Camino to Shekell in March 2005 to have the work done. Shekell gave Sup a written estimate of $5,000 for the cost of installing the used replacement engine and transmission, both of which Sup supplied. The written estimate was in the name of JSA. Sup testified that he paid Shekell $5,000 in advance for the work. Sup also testified that although the El Camino would not pass a smog test when he took it to Shekell's shop, it would accelerate to freeway speed.

Sup went back to Shekell's shop in April of that year, saw the engine out of his El Camino and agreed to the installation of a new water pump at a cost of $250 plus detailing costing an additional $100. In mid-May, 2005, when Sup next saw his vehicle, the engine and transmission had been mounted. Shekell gave him a list of work that had been done, which, with the exception of the water pump and detailing, Sup assumed was included in the original estimate. Sup testified that Shekell "tallied" the work list, which was "well in excess of $7,000." Sup became upset and threatened to "pull the plug on the whole project and haul all the parts home." In response, Shekell asked Sup to come to the shop to work out a deal.

6

When Sup went to Shekell's shop in early June 2005, Shekell presented him with a detailed listing of costs in the amount of about $13,000. After Sup questioned the amount, Shekell lowered it to about $11,000. Sup testified that, "at that point [he] had a choice of taking all [his] parts home having spent the money, or to have [Shekell] continue the work and have him complete the project." Sup reluctantly agreed to the revised estimate of $11,000. Sup testified it was his "understanding that the vehicle would be complete and running, and a smog-legal vehicle."

Sup later agreed to pay Shekell to replace the fuel injectors at an additional cost of about $1,800 and redo the rear-end differential at a cost of between $1,200 and $1,500.

In October 2005 Shekell called Sup and told him his car was ready to be picked up. When he arrived at Shekell's shop, Sup, who had paid $11,000, offered to pay Shekell the additional $3,000 Sup thought he owed. Shekell did not present Sup with a bill, but told Sup he wanted an additional $2,000, that is, $5,000 more than the $11,000 Sup had already paid. Sup paid Shekell the additional $5,000, for a total of $16,000, but Sup never received the $750 Shekell said he received when he sold Sup's old engine and transmission. When asked at trial why he paid the additional $2,000 Shekell charged him, Sup replied: "I thought that would end the—give me the car and finally have the whole matter settled and done. When I did pick the car up, the other option was to say no and walk home essentially. It's the industrial area of El Cajon and probably a mile to the nearest shopping center."

Sup testified that when he drove the El Camino onto the freeway, he had trouble accelerating to highway speed and his car got "stuck in second gear." He drove home at

7

50 miles per hour in the slow lane. Sup later called Shekell, who told him to bring the car back to the shop. Sup took the car back to the shop that same month (October 2005) and expected Shekell to do a warranty repair.

In October 2006 Sup discovered the BAR web site, but he did not contact the BAR because he believed Shekell's work on the El Camino would cease if he did, and he wanted to give Shekell "as much latitude as needed to try to get the job done."

In January 2007 Shekell informed Sup that the work on his El Camino was done. On January 22, when Sup went to Shekell's shop to pick up the car, Shekell tried to collect an additional $1,294 from him. Sup testified his El Camino ran "extremely rough" and still would not reach highway speeds.

Sup indicated in his testimony that during most of the time he dealt with Shekell, he believed Shekell was operating a licensed repair shop. In December 2006 or January 2007, Shekell told Sup that his license had lapsed.

Kendall testified that on January 22, 2007, an hour after Sup picked up his car, he (Kendall) returned to Shekell's shop with a coworker and a CHP officer to investigate a complaint filed by Sup. Kendall told Shekell he wanted to talk to him about Sup's car and Shekell's repairs and requested the records of Shekell's work on Sup's car as well as the records Ramirez told Kendall he (Ramirez) had given to Shekell. Shekell said he had not worked on Sup's vehicle and he did not charge Sup any money. Kendall said he had in his hand a copy of a faxed invoice Sup received. Kendall received that copy from Sup. Shekell would not respond to Kendall's request for the records Ramirez gave to

8

Shekell. In Kendall's opinion, the original $5,000 estimate for the work on Sup's El Camino was reasonable, but $11,000 and $16,000 were both very high.

*Count 5*

Tony Giralamo, an investigator with the San Diego County District Attorney's Office, acting in conjunction with the BAR, contacted Shekell while posing as an automobile repair customer named Tony Gallo. Giralamo called Shekell on October 17, 2007, and took a pickup truck supplied by the BAR to Shekell's shop the next day. In a test drive, the truck did not make the differential noise about which Giralamo complained and Shekell suggested an inspection.

Several weeks later, Giralamo requested the differential inspection Shekell had suggested. After a test drive, during which the truck again did not make the differential noise Giralamo complained about, Shekell told Giralamo he did not know exactly what was wrong and he would have to further inspect the truck. Giralamo also asked about the cost of purchasing and installing a lift kit. On the back of a business card, Shekell gave Giralamo an estimate of $2,290 for that work, and Giralamo gave Shekell a $1,500 deposit to order the lift kit. Giralamo dropped the truck off when Shekell notified him the parts had arrived. Shekell said he would do the differential inspection with the lift kit installation. They did not discuss a price for the differential inspection. When Giralamo picked up the truck in early December 2007, he was required to pay an additional $1,245, which he had never approved, for a total of $2,745, $455 more than the original $2,290 estimate.

9

DISCUSSION

I

*SUFFICIENCY OF THE EVIDENCE*

Shekell first contends the evidence is insufficient to support his petty theft, grand theft, and attempted grand theft convictions because the prosecution alleged he committed the offenses by false pretenses, but there is no evidence he "misrepresented a single thing regarding his repair of the three vehicles involved," and all of the work he did "was done with the full approval of the customers."  We conclude Shekell has failed to meet his burden of establishing that his convictions are unsupported by substantial evidence.

1.  *Applicable legal principles*

a. *Theft by false pretenses*

"A theft conviction on the theory of false pretenses requires proof that (1) the defendant made a *false pretense or representation* to the owner of property; (2) with the *intent to defraud* the owner of that property; and (3) the owner transferred the property to the defendant in *reliance* on the representation.  [Citations.]  In this context, reliance means that the false representation 'materially influenced' the owner's decision to part with his property; it need not be the sole factor motivating the transfer.  [Citation.]  A victim does not rely on a false representation if 'there is no causal connection shown between the [representations] alleged to be false' and the transfer of property."  (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842, italics added.)

A false pretense or representation "may be either express or implied from words or conduct." (*People v. Whight* (1995) 36 Cal.App.4th 1143, 1151.) Reliance on a false pretense or representation may be inferred from all the circumstances. (*People v. Wooten*, *supra*, 44 Cal.App.4th at p. 1843; see also *People v. Whight*, at p. 1151 ["Reliance on a false representation may be, and in some cases must be, inferred from the evidence."].)

b. *Standard of review*

In assessing Shekell's challenge to the sufficiency of the evidence, we apply the substantial evidence standard of review. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1124.) Under that standard of review, we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

The Court of Appeal recently explained that, "when a criminal defendant claims insufficiency of the evidence on a particular element of the crime of which he was convicted, we presume the evidence of that element was sufficient, and the defendant bears the burden of convincing us otherwise. To do so, the defendant . . . must set forth in his opening brief all of the material evidence on the disputed element *in the light most favorable to the prosecution*, and then must persuade us that that evidence cannot reasonably support the jury's verdict." (*People v. Battle* (2011) 198 Cal.App.4th 50, 62, italics added; see also *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574 ["If the

11

defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence he ignores."].)

"The uncorroborated testimony of a single witness is sufficient to sustain a conviction [or true finding on an enhancement allegation] unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; People v. Jones (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

2. *Analysis*

Shekell acknowledges that the prosecution's theory of criminal liability at trial was that he committed theft by false pretenses against Guishard and Sup and attempted theft by false pretenses against Giralamo by (among other things) "[misrepresenting] his status as an owner of a licensed automotive repair shop." Shekell asserts that "[n]ot a single piece of evidence was presented to show that [he] lied to Guishard or Sup or Giralamo" to induce them to pay him to work on their vehicles. "[T]here was no evidence," he asserts, "to show that there was fraudulent conduct on his part."

As is all too often the case when a criminal defendant claims on appeal that the evidence is insufficient to support his or her convictions, Shekell fails to set forth in his

12

opening brief the material evidence *in the light most favorable to the prosecution*, as he is required to do under the well-established rules (discussed, *ante*) governing application of the substantial evidence standard of review. (See *People v. Johnson*, *supra*, 26 Cal.3d at p. 578; *People v. Battle*, *supra*, 198 Cal.App.4th at p. 62.)

The prosecution successfully argued to the jury that Shekell was guilty of theft and attempted theft by false pretenses because he falsely represented to the victims that (among other things) he was operating a licensed repair shop. The record shows the prosecution presented substantial evidence from which a rational jury could find beyond a reasonable doubt that Shekell falsely represented to the victims that he was operating a licensed repair shop, and he did so with intent to deceive them and induce them to pay him for working on their vehicles.

Specifically, it is undisputed that Shekell owned and operated JSA, an automobile repair business on North Magnolia Avenue in El Cajon. Kendall, the BAR program representative who conducted an investigation to determine whether Shekell was operating without a license, testified that JSA was no longer licensed as of December 2, 2005; and Shekell's repair shop then should have been closed, and it should not have continued working on cars for the public, because it was not licensed. According to Kendall, Shekell continued to operate his unlicensed repair shop from that date through 2007.

The prosecution also presented evidence that in April 2006, Shekell began displaying to the public, in his shop, the license of Any Transmissions Auto Repair, the repair shop business of Ramirez, who started renting space in Shekell's shop that month.

13

Ramirez testified that although he left Shekell's shop in June 2006 to work elsewhere, Shekell continued to display Ramirez's BAR license in his shop. According to Ramirez, Shekell did not return his license until May or June of 2007 after Ramirez made several requests—including three that he made in person—that Shekell do so.

The prosecution also presented evidence that after his shop became unlicensed, Shekell created invoice forms that used the name of Ramirez's licensed business, Any Transmissions Auto Repair, and that Shekell gave Guishard an invoice receipt in the name of Ramirez's business.

In addition, the prosecution presented Guishard's testimony that when he took his Ford Ranger to Shekell in June 2006, he believed he was taking his vehicle to a licensed automotive facility. Sup similarly indicated in his testimony that during most of the time he dealt with Shekell, he believed Shekell was operating a licensed repair shop; and it was not until December 2006 or January 2007 that Shekell told Sup that his license had "lapsed."

The foregoing substantial evidence, viewed in the light most favorable to the judgment, supports Shekell's convictions by establishing that Shekell—by posting Ramirez's license in his shop even after Ramirez repeatedly asked Shekell to return it to him and by using the name of Ramirez's licensed business on his business forms—*falsely* represented to the victims that he was the operator of a licensed automotive repair business during his business dealings with them. The fact that this false pretense was implied, rather than express, is immaterial. A false pretense may be implied from words or conduct. (*People v. Whight*, *supra*, 36 Cal.App.4th at p. 1151.)

14

Also, from the foregoing evidence, a reasonable jury could find beyond a reasonable doubt that Shekell knew his shop was unlicensed and by law he was not permitted to operate that shop when he made the false representations, that he engaged in the false pretense with intent to defraud the victims to induce them to do business with him, and that Guishard and Sup paid money to Shekell in reliance on Shekell's false representations.[2] For all of the foregoing reasons, we conclude substantial evidence supports Shekell's convictions.[3] (See *People v. Wooten*, *supra*, 44 Cal.App.4th at p. 1842.)

However, without any citation to the trial record, Shekell claims "[t]he prosecution['s] assertion that [he] committed theft by false pretense when he 'mis-represented' his status as an owner of a licensed automotive repair shop is belied by the fact that the work that he did on each of the three cars was as a general mechanic, and as such he does not need to have any licensing. NONE." In making this claim, Shekell disregards the fundamental legal precept discussed, *ante*, that, under the substantial evidence standard of review, the evidence must be viewed *in the light most favorable to the judgment*. (See *People v. Johnson*, *supra*, 26 Cal.3d at p. 578; *People v. Battle*, *supra*, 198 Cal.App.4th at p. 62.) The substantial evidence discussed, *ante*, when viewed

---

[2]     With respect to Shekell's conviction of attempted grand theft, the evidence shows Giralamo was working undercover on behalf of the BAR, and, thus, he did not rely on Shekell's false pretense. Proof of actual reliance by Giralamo was not required for that conviction because Shekell was only charged with *attempted* grand theft.

[3]     In light of our conclusion, we need not address Shekell's additional claim that "not a single piece of evidence was presented to show that [he] fraudulently did the work for Guishard or Sup or Giralamo."

15

in the light most favorable to the judgment of conviction, shows that Shekell did *not* work on Guishard's, Sup's, and Giralamo's vehicles as just a general mechanic. It clearly shows Shekell worked on the vehicles as the owner of JSA under the false and *fraudulent* pretense that the facility was a properly licensed automobile repair shop. Shekell's claim is without any legal or factual support.

II

*CLAIM THAT SHEKELL'S CONVICTIONS UNDER*
*"BROADER" THEFT STATUTES ARE BARRED*

Next, Shekell claims his convictions under the "broader" theft statutes (§§ 484 & 487(a)) are barred because the prosecution presented no evidence that he defrauded his customers, and, thus, his conduct is "covered ONLY" by more specific statutes codified in the Business and Professions Code, violations of which are punishable only as misdemeanors under section 9889.20 of that code. This claim is unavailing.

Shekell asserts "[i]t was established at trial that [he] violated a number of Business and Professions Code sections, all of which carry a misdemeanor punishment." Specifically, he maintains his conduct is punishable under the following three "more specific" sections of the Business and Professions Code that regulate the conduct of an owner of an automotive repair business: (1) section 9884.6, which prohibits a person from being an automobile repair dealer unless registered; (2) section 9884.8, which requires that all labor and parts used in service work be recorded and itemized in an invoice; and (3) section 9884.9, which requires customer authorization written estimates

16

and subsequent increases. Shekell contends "the broader charges of felony theft should never have gone forward" because "there is NO fraudulent conduct shown."

The Attorney General construes Shekell's contention to be a claim that his convictions under the general theft statutes are barred under the so-called "*Williamson* rule"[4] because his conduct is covered by the foregoing "more specific" sections of the Business and Professions Code. In his reply brief, Shekell objects that the Attorney General "misunderstands [his] argument," and asserts that "[his] argument is not that both the theft Penal Code [s]ection and the Business and Professions Code sections cover the same conduct, but that [his] conduct is covered ONLY by the Business and Professions Code sections" because "the prosecution presented no evidence that [he] defrauded his customers."

We need not address the issue of whether Shekell's prosecution under what he calls the "broader charges of felony theft" is barred under the *Williamson* rule, because his opening and reply briefs make clear this issue is not before us. Shekell's sole

---

[4]     The California Supreme Court has explained that, "[u]nder the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute." (*People v. Murphy* (2011) 52 Cal.4th 81, 86, quoting *In re Williamson* (1954) 43 Cal.2d 651, 654.) *Murphy* further explains that, "[a]bsent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.'" (*Murphy*, at p. 86, quoting *People v. Watson* (1981) 30 Cal.3d 290, 295–296.) "In its clearest application," the *Murphy* court stated, "the [*Williamson*] rule is triggered when a violation of a provision of the special statute would inevitably constitute a violation of the general statute." (*Murphy*, at p. 86.)

17

argument here is that the felony theft charges "should never have gone forward" because "there is NO fraudulent conduct shown." This argument is an iteration of his claim (discussed, *ante*) that his convictions are not supported by substantial evidence. As we have already concluded that substantial evidence supports Shekell's convictions, we also conclude this iteration of his insufficiency-of-the-evidence claim is unavailing.

III

*CLAIMS OF ERRONEOUS ADMISSION OF CHARACTER EVIDENCE AND*
*INEFFECTIVE ASSISTANCE OF COUNSEL*

Last, Shekell contends the court violated his federal constitutional right to due process by erroneously admitting "inadmissible bad character evidence, which included evidence that [he] was a liar, a danger, and a violator of multiple rules and regulations." He also contends his trial counsel's failure to object to that evidence amounted to ineffective assistance of counsel. These contentions are unavailing.

As a preliminary matter we note (as the Attorney General correctly points out by means of an objection) that, with but a few exceptions, Shekell does not delineate in his opening brief the specific evidence he claims the court erroneously admitted to which his trial counsel failed to object. Rather, in his two-and-a-half-page argument, he refers to the statement of facts presented at the beginning of his brief and asserts, "The laundry list of character assassination efforts, already presented in the statement of facts above, need not be cut and pasted to this section in order to make the point that the error was huge." Offering generalities, Shekell states, for example, that "[*m*]*uch of the evidence* was pure hearsay and couldn't have come in even if relevant" (italics added), but he does not

18

identify the evidence to which he is referring.  He asserts "*some* was pure opinion and speculation and shouldn't have been presented for that reason" (italics added) and "all of *it* had *its* relevance outweighed enormously by *its* overly prejudicial value and shouldn't have been presented" (italics added), but he again does not inform this court to what evidence he is referring.

In his reply brief, in response to the Attorney General's objection to these generalities, Shekell, through his current counsel Allen Bloom, offers several pages of specific points after both criticizing the Attorney General for failing to "address[] a single factual presentation made by appellant," and after asserting that the Attorney General's "failure to address the facts is the legal equivalent of the mythical ostrich putting its head in the ground in the hopes that those [*sic*] will somehow not notice that there is a 200 pound bird with a three foot neck contorted with his head in the sand."  In a lengthy footnote, quoting from a book titled *Animal Facts, Animal Fables*, Shekell offers a history lesson regarding the popular myth of the ostrich that hides its head in the sand at the first sign of danger.

To the extent Shekell raises specific claims of evidentiary error for the first time in his reply brief, we conclude he has forfeited them for purposes of this appeal.  "Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument." (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453; see also *Varjabedian v. Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an

19

appellant."]; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 ["We refuse to consider the new issues raised by defendant in his reply brief."].) The Court of Appeal has also explained that "'[o]bvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission. Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.'" (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.) As Shekell makes no attempt to offer a good reason for his failure to properly raise his points in his opening brief, considerations of fairness require that they be deemed forfeited.

One of the claims of error that Shekell appears to be making in his opening brief, and is inappropriately set forth in the statement of facts, is his claim that the court erroneously admitted evidence that Shekell's "previous license to operate an auto repair business had been revoked." In support of this claim, Shekell cites pages 9 and 30 of the reporter's transcript. The Attorney General correctly points out that Shekell's page references are to *pretrial* proceedings. Our review of the *trial* record discloses that Kendall testified that as of December 2, 2005, Shekell's repair shop was "no longer licensed"; and Sup testified that in December 2006 or January 2007, Shekell told him that his license had "just lapsed" and he needed to renew it. Shekell has cited no trial evidence showing he was unlicensed due to revocation, and our review of the trial record has disclosed no such evidence. We conclude this claim of error is without merit.

20

Shekell also claims the court prejudicially erred by admitting Kendall's testimony that he was accompanied by a CHP officer when he went to Shekell's shop on December 2, 2005, because he did not feel safe going alone due to some unspecified prior "incidents." The record shows that this testimony consisted of a few brief statements, the references to prior incidents did not directly implicate Shekell, Kendall did not attribute those incidents to any particular person, and he did not testify to any difficulty during his contact with Shekell that would suggest Shekell was dangerous. Assuming arguendo the court erroneously admitted this evidence, we conclude that, in light of the strong evidence of Shekell's fraudulent conduct (discussed, ante), any such error did not render the trial fundamentally unfair, and Shekell has failed to meet his burden of showing a reasonable probability he would have obtained a more favorable outcome in the absence of the error. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.] Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error."]; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We need not, and do not, reach the merits of Shekell's ineffective assistance of counsel claim, which is based on his trial counsel's alleged failure to object to evidence, as Shekell acknowledges his trial counsel asked for sidebar conferences at various points during the trial, the recording of these conferences was not requested, and "[i]t is

possible, perhaps even likely, that during these sidebars the defense articulated certain objections to testimony or evidence." Shekell also acknowledges that "since the content of these sidebars is not part of the record, [he] is unable to know if the defense entered objections to a number of issues which objection was then overruled by the court, or if no objection was ever made." Shekell's claim of ineffective assistance of counsel is based on speculation.

DISPOSITION

The judgment is affirmed.


                                        NARES, Acting P. J.

WE CONCUR:


HALLER, J.


McINTYRE, J.


22